IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MICHAEL RUGGIERO,<br><br>                    Plaintiff,<br><br>      v.<br><br>BRIAN NOCENTI,<br><br>                    Defendant. | :<br>:<br>:  Civil Action No. 18-cv-3047 (JHS)<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

**PLAINTIFF, MICHAEL RUGGIERO'S,
PRETRIAL MEMORANDUM**

Plaintiff, Michael Ruggiero, respectfully submits this Pre-Trial Memorandum pursuant to the Court's February 25, 2020 scheduling order.

**I.     DETAILED FACTUAL SUMMARY OF PLAINTIFF'S CONTENTIONS:**

This is a case concerning a reneged contract for the purchase of rare and professionally graded playing cards for the game "Magic: The Gathering." The Defendant, Brian Nocenti, is one of the biggest collectors and sellers of Magic: The Gathering ("Magic") Cards in the United States. Trading these types of cards is Mr. Nocenti's full-time job. The Plaintiff, Michael Ruggiero, is not a professional trader, but a passionate collector of Magic cards. In addition, Mr. Ruggiero collects Magic cards to secure his financial future.

Mr. Ruggiero and Mr. Nocenti met each other through mutual friends in the Magic community. Mr. Ruggiero learned that Mr. Nocenti had a large number of Magic cards, specifically the "Beta Edition," which is the specific type that Mr. Ruggiero collects. Mr. Nocenti invited Mr. Ruggiero to his house to review his collection and the items for sale. They met for the first time on March 11, 2017 at Mr. Nocenti's house. The parties began to both edit an Excel list of the Cards that identified the specific cards that Mr. Ruggiero would buy.

The excel list includes the name of the card, the grade, and the price of each card. The parties almost exclusively communicated through Facebook Messenger, a chat feature of Facebook. This is a common means of communication that traders and collectors of Magic cards utilize. The parties' chats are fully preserved.

Mr. Ruggiero and Mr. Nocenti met in person again on May 7, 2017, at Mr. Nocenti's house, to review the collection Mr. Ruggiero was buying.

On May 9, 2017, Mr. Ruggiero advised Mr. Nocenti that he would be selling off part of his valuable collection to finance this deal. (FBM 7/4/17 10:45 p.m.-10:46 p.m.) Mr. Ruggiero sought Mr. Nocenti's advice on what price to ask for the cards he was selling and specifically stated that he was selling these cards in order to pay Mr. Nocenti for their deal. (FMB 5/28/17 10:47 a.m.-5/29/17 9:08 p.m.)

Based on the final version of the Excel sheet, the total contract price for the 143 Cards was $177,415.00, due to the extremely rare and irreplaceable value of the Magic Cards. The parties agreed that a very important aspect of the deal was that Mr. Ruggiero had to pay Mr. Nocenti $70,000.00 within the first year.

On May 29, 2017, Mr. Ruggiero sent Mr. Nocenti an email describing the types of cards Mr. Nocenti would hold while the deal was negotiated. In this email, Mr. Ruggiero stated he was "looking to purchase any and all Beta cards that meet this criteria." In this email, Mr. Ruggiero also acknowledged that Mr. Nocenti wanted $70,000.00 in the first year and advised that he would sell part of his own collection to finance the transaction.

Mr. Nocenti will argue that he never read this May 29, 2017 email. Even if this fact is significant (which is denied), the parties agreed to all the essential terms in writing over and over within their Facebook chat. The following essential terms were agreed to in writing in the

Facebook chat: 1) the list of "Magic" cards to be sold, based on the Excel sheet both parties prepared; 2) the price ($177,415.00 total, $70,000.00 to be paid within year one); and 3) the timeline, up to three years, but $70,000.00 to be paid by the end of June 2018. Although Mr. Nocenti only appears to argue the time of performance was not agreed upon, the time of performance terms were confirmed multiple times in the FBM chats. (*See, e.g.,* string of chats on 7/4/17.)

> For example, Mr. Ruggiero and Mr. Nocenti confirmed the timeline on 7/4/17:
>
>> Mr. Nocenti 10:42 "Hi Mike, not trying to push you buy [sic] realistically what do you think we're looking at on our timeline for the pile of betas?"
>>
>> Mr. Ruggiero 10:43 p.m. "Not at all… let's make sure we are super clear and on the same page. do you feel that I didn't delineate my plan clearly?"
>>
>> Mr. Nocenti 10:44 p.m. "I know we had talked about 1, 2 and 3 year options just didn't know which we were targeting for or if we were leaving it open ended."
>>
>> Mr. Ruggiero 10:44 p.m. "Gotcha…makes sense. So as we've discussed, I think much of that depends on what sells of mine."
>>
>> Mr. Nocenti 10:45 p.m. "that is correct."
>>
>> Mr. Ruggiero 10:45 p.m. "I will make sure you get $70k with in [sic] the next 12 months."
>>
>> …
>>
>> Mr. Nocenti: 10:46 p.m. "Thank you for clearing this up for me."

Mr. Ruggiero started his payments in June 2017. Mr. Nocenti never pressured Mr. Ruggiero to speed up payment prior to Mr. Nocenti's breach in May 2018. As an example, on June 15, 2017, Mr. Nocenti wrote to Mr. Ruggiero: "Keep your health in good shape we'll hopefully get the payments rolling soon… Your health is the most important take care of yourself the cards will be here." (FBM 6/15/2017 12:39 p.m.; 12:48 p.m.) On June 20, 2017,

Mr. Nocenti wrote to Mr. Ruggiero: "Hope you feel better.  I know we were planning on starting payments this month [June] let's move it to next month if that's better for you."  (FBM 6/20/2017 11:15 a.m.)

Mr. Ruggiero sent Mr. Nocenti an initial $5,000.00 payment on **June 26, 2017**.  June 26, 2017 was the start date for the payments – a fact that would be confirmed multiple times in writing.  (FBM 6/26/17 7:07 p.m.; 9:42 p.m.; 10:11 p.m. (emphasis added).)

On June 28, 2017, Mr. Ruggiero stated that he intended to make frequent payments within the first year and stated:  "It is important to me that you feel secure and confident in our dealings.  If you would [sic] a larger payment and/or in a shorter time frame, please don't hesitate to let me know and I will accommodate."  (FBM 6/28/17 10:42 a.m.)

In late June 2017, the parties reaffirmed the timeline of $70,000.00 due within the first year, and up to three years to pay the total amount.  On July 4, 2017, Mr. Ruggiero stated in writing that he would be sure to pay $70,000.00 within one year and would try to pay the full amount of $177,415.00 in one year if he was able to.  (FBM 7/4/17 10:45-46 p.m.)

On July 4, 2017, Mr. Nocenti replied:  "Thank you for clearing this up for me."  (FBM 7/4/17 10:46 p.m.)  That same day, Mr. Ruggiero followed up and asked: "Do you need a certain amount of money from me by a certain time?" to which Mr. Nocenti replied: "no just trying to see where I'm going to be so I can plan accordingly…The plan we have gives me the breathing room I needed in order to agree to it."  (FBM 7/4/17 10:46; 10:49; 10:52 p.m.)

On July 27, 2017, Mr. Ruggiero made another $5,000.00 payment.  On August 15, 2017, Mr. Ruggiero made another $5,000.00 payment.

On August 25, 2017, Mr. Ruggiero asked if he could begin to pick up some cards when he paid $30,000.00. Mr. Nocenti replied, "sounds like a plan." (FBM 8/25/17 1:53 p.m.) Once Mr. Ruggiero hit the $30,000.00 mark, Mr. Nocenti did not give him any cards as promised.

On September 26, 2017, Mr. Ruggiero made another $5,000.00 payment.

On October 7, 2017, Mr. Ruggiero advised that he would not be able to pay the **full** contract price of $177,415.00 within one year. (FBM 10/7/17 12:43 p.m.)

On October 30, 2017, again Mr. Ruggiero confirmed over and over that Mr. Nocenti was comfortable with their payment schedule. Mr. Nocenti was. Mr. Nocenti stated "as long as I have what I need to get my project started **I honestly could care less**." (FBM 10/30/17 12:50 p.m. (emphasis added).)

On January 23, 2018, Mr. Nocenti asked Mr. Ruggiero if he was still able to make the $70,000 payment by the end of June 2018. He asked: "Just wanted to make sure we are on track for **June** [2018]…I'm planning on starting my home project in late April or May [2018] so this will line up nicely." Mr. Ruggiero replied: "yes indeed." (FBM 1/23/18 12:14 p.m.; 1:24 p.m. (emphasis added).)

On February 1, 2018, Mr. Ruggiero paid another $5,000.00.

In March 2018, the parties discussed, but ultimately did not agree to, extending the deadline to make the first-year payments by one month. On March 18, 2018, Mr. Ruggiero asked: "We started our payments on June 26th, so I'm asking if the additional month works with your plans?" Mr. Nocenti said it was "doable," but ultimately Mr. Ruggiero did not require the additional time. He stated: "You want $70k by the **end of june** [sic] and that will work best for you?" Mr. Nocenti unequivocally replied: "**That would be perfect**." Mr. Ruggiero stated, "Ok,

-5-

very good." (FBM 3/18/18 10:20 a.m.; 10:22 a.m.; 10:25 a.m.; 10:26 a.m.; 10:28 a.m. (emphasis added).)

On March 19, 2018, Mr. Ruggiero paid another $5,000.00.  On April 10, 2018, Mr. Ruggiero paid another $5,000.00.  On May 18, 2018, Mr. Ruggiero paid another $5,000.00.

On May 5, 2018, Mr. Nocenti acknowledged how much the price of the Cards that were the subject of their deal have been increasing in value.  (FBM 5/5/18 9:25 p.m.)

On May 18, 2018, Mr. Ruggiero said that he was on track to pay the initial $70,000.00 by the **end of June**.  Mr. Nocenti replied: "ty [thank you] Mike."  (FBM 5/18/18 7:53 a.m.)

Then, abruptly, just 11 days later, on May 29, 2018, Mr. Nocenti stated to Mr. Ruggiero that his deadline to pay the initial $70,000.00 was "past due" and due to this he was going to refund the money paid and cancel the contract.  (FBM 5/19/18 2:15 p.m.; 2:16 p.m.)

Mr. Ruggiero emailed Mr. Nocenti the same day advising that the one year was not expired until the end of June, but nonetheless, offering to pay the balance to reach $70,000.00 that day.  Mr. Nocenti wrote back stating that he believed the contract began on May 7, 2017, and any changes were not "official."  (*Id.*)

In a showing of good faith, having already paid $40,000.00 to date, Mr. Ruggiero sent Mr. Nocenti the remaining $30,000.00 (plus transaction fees), totaling $70,000.00 paid by May 29, 2018, over one month prior to actual expiration of the first $70,000.00 coming due. Mr. Nocenti refunded Mr. Ruggiero the $70,000.00 that same day.

Mr. Nocenti testified in his deposition that he sold some of the subject cards to other buyers for cash, and during this deal worth over $100,000, he doesn't know the buyers names, their contact information, and has no record of the payment or sale (Def.'s Dep. 225:13-229:15.)

At its core, this is an action to enforce a contract.[1] The elemental aspects necessary to give rise to an enforceable contract are "offer," "acceptance," "consideration" or "mutual meeting of the minds." *Schreiber v. Olan Mills*, 426 Pa. Super. 537, 541, 627 A.2d 806, 808 (1993). Here, there was an offer from Mr. Nocenti to sell to Mr. Ruggiero 143 BGS Graded Beta Edition Magic: The Gathering Cards for the price of $177,415.00 and an acceptance of this offer by Mr. Ruggiero.

Here, a valid contract existed because there was an offer to sell the subject Magic Cards, acceptance of the offer, and consideration ($40,000.00 paid to Mr. Nocenti over the first 11 months). Mr. Nocenti breached the parties' contract when he reneged on May 29, 2018. A breach of contract action involves (1) the existence of a contract, (2) a breach of a duty imposed by the contract, and (3) damages. *J.F. Walker Co., Inc. v. Excalibur Oil Group, Inc.*, 792 A.2d 1269 (Pa. Super. 2002). Here, a valid bilateral contract existed to sell the subject Cards for $177,415.00, with $70,000.00 to be paid by June 26, 2018, and some cards to be delivered to Mr. Ruggiero after $30,000.00 was paid. Mr. Nocenti reneged on this contract. As a result, Mr. Ruggiero has suffered significant and irreparable damages from the breach, including but not limited to: 1) Mr. Ruggiero sold off his own priceless collection in order to finance the transaction with Mr. Nocenti (and Mr. Nocenti even aided in this process); 2) Mr. Ruggiero will not be able to obtain this specific collection of 143 Magic Cards from any other source; 3) Mr. Ruggiero lost out on significant investments when he sold off his own cards in 2017-2018; and 4) Mr. Ruggiero lost out on significant investments from the completion of the instant Agreement with Mr. Nocenti. These damages are confirmed in Mr. Ruggiero's expert reports,

---

[1] Plaintiff is in no way waiving its other claims of the complaint, which were fully briefed in response to Defendant's Motion for Summary Judgment. Plaintiff uses its breach of contract claim only to assist the Court in understanding his legal theory, and the factual support for same.

both for the lost investment from the time of the contracting to the time of breach and the lost value of the cards he sold to finance this transaction.

On June 8, 2018, Plaintiff's counsel sent Defendant a letter directing Defendant not to sell the Cards that are the subject of this case as same would constitute the spoliation of evidence. Mr. Nocenti testified that he received this letter, but nonetheless, after receiving the letter he decided to sell a large portion of the subject Cards for about $100,000.

## II. WITNESSES TO BE CALLED AT TRIAL:

### A. Michael Ruggiero:

Plaintiff, Michael Ruggiero, will testify about the transaction at issue as detailed above. Specifically, Mr. Ruggiero will testify that the parties agreed to the terms of the contract and that Mr. Nocenti reneged on the agreement on May 29, 2018.

### B. Brian Nocenti

Defendant, Brian Nocenti, will testify about his statements to Mr. Ruggiero, his promises and his representations. Mr. Nocenti will also testify about his spoliation of the cards at issue. Plaintiff will request that Mr. Nocenti bring his tax returns to trial for the year in which he testified that he sold some of the subject cards for $100,000.

## III. EXPERT WITNESSES TO BE CALLED AT TRIAL:

### A. Travis Landry:

Travis Landry is a damages expert. He will testify about the value of the Cards at the time of the breach and, therefore, the lost investment. He will also testify about the lost investment for the cards that Mr. Ruggiero sold to finance the transaction. He will also testify generally about Magic cards and their collectability and value.

  **B.** <u>**Nick Coss:**</u>

Nick Coss is a damages expert. He will testify about the value of the Cards at the time of the breach and, therefore, the lost investment. He will also testify about the lost investment for the cards that Mr. Ruggiero sold to finance the transaction. He will also testify generally about Magic cards and their collectability and value.

The CVs for Mr. Landry and Mr. Coss, respectively, are attached as Exhibit A.

**IV.** <u>**DAMAGES**</u>

Money damages are sought as well as specific performance of the contract to the extent there are any remaining subject Cards that have not been sold despite the litigation hold letter.

The contract price was $177,415.00 for the subject cards.

Mr. Ruggiero sold his cards to finance the transaction for $62,592 in 2017 and early 2018.

Expert Nick Coss valued the subject cards at a price of $305,500 in May 2018 (the time of breach). The difference between $305,547 (value at time of breach of contract) and $177,415.00 (agreed upon contract price) is $128,132.

Mr. Coss values the cards that Mr. Ruggiero sold to others to finance the transaction to be $92,806 in May 2018 (time of breach of contract). In 2019, the cards Mr. Ruggiero sold to finance the transaction were worth approximately $153,355 ($153,355 – $62,592 = $90,763 loss).

Mr. Landry's values are very similar.

Thus, the total economic damages are $128,132 (breach of contract) + $90,763 (promissory estoppel) = **$218,895.**

The parties' stipulations are attached hereto as Exhibit B.

The parties have conferred on the trial exhibits and Plaintiff does not have any objections.

Plaintiff anticipates bringing a motion *in limine* regarding Plaintiff's willful spoliation of evidence and intentional disregard of a hold letter. Plaintiff will seek an adverse inference and monetary sanctions.

Date:  June 15, 2020     Respectfully submitted,

By: *s/ Alexandra S. Jacobs*
John J. Levy (PA ID No. 42377)
Michael J. Fekete (PA ID 88506)
Alexandra S. Jacobs (PA ID No. 318355)
MONTGOMERY, MCCRACKEN, WALKER & RHOADS, LLP
A Pennsylvania Limited Liability Partnership
457 Haddonfield Road
Cherry Hill, NJ  08003
Email: ajacobs@mmwr.com
*Attorneys for Plaintiff, Michael Ruggiero*

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF EASTERN PENNSYLVANIA

| | |
|---|---|
| MICHAEL RUGGIERO,<br><br>        Plaintiff,<br><br>  v.<br><br>BRIAN NOCENTI,<br><br>        Defendant. | :<br>:<br>:  Civil Action No. 18-cv-3047-JHS<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

## **CERTIFICATE OF SERVICE**

  I hereby certify that on the 15th day of June 2020, I caused a true and correct copy of the foregoing Plaintiff, Michael Ruggiero's, Pretrial Memorandum to be served electronically on counsel of record as follows:

Christopher J. Amentas, Esquire
Carosella & Associates, P.C.
882 S. Matlack Street, Suite 101
West Chester, PA 19382
E-Mail:  chris@carosella.com
*Attorneys for Defendant, Brian Nocenti*

Date:  June 15, 2020            s/ *Alexandra S. Jacobs*
                       Alexandra S. Jacobs