IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MICHAEL RUGGIERO,<br><br>                    Plaintiff,<br><br>    v.<br><br>BRIAN NOCENTI,<br><br>                    Defendant. | Civil Action No. 18-cv-3047 (JHS) |

**PLAINTIFF, MICHAEL RUGGIERO'S,
AMENDED PRETRIAL MEMORANDUM**

Plaintiff, Michael Ruggiero, respectfully submits this Amended Pre-Trial Memorandum pursuant to the Court's Fourth scheduling order.[1]

**I.     DETAILED FACTUAL SUMMARY OF PLAINTIFF'S CONTENTIONS:**

This case concerns a breach of contract by the Defendant, Brian Nocenti, for the sale of rare and professionally graded playing cards that have been created for the game "Magic: The Gathering" to Plaintiff, Michael Ruggiero.  The Defendant is one of the biggest collectors and sellers of Magic cards in the United States.  Trading these types of cards is Defendant Nocenti's full-time job.  Plaintiff Ruggiero, while not a professional trader of Magic cards, is a passionate collector of them.  Mr. Ruggiero also collects them as an investment.

Mr. Ruggiero and Mr. Nocenti met each other through mutual friends in the Magic: The Gathering community.  Mr. Ruggiero learned that Mr. Nocenti had a large number of Magic cards, specifically the "Beta Edition," which is the specific type that Mr. Ruggiero collects. Mr. Nocenti invited Mr. Ruggiero to his house to review his collection and the items for sale. They met for the first time on March 11, 2017 at Mr. Nocenti's house.  The parties began to both

---

[1] Plaintiff originally submitted a pretrial memorandum on June 15, 2020 but submits this amended pre-trial memorandum to include new issues and facts from that time to present.

edit an Excel list of the Cards that identified the specific cards that Mr. Ruggiero would buy. The excel list includes the name of the card, the grade, and the price of each card. The parties almost exclusively communicated through Facebook Messenger, a chat feature of Facebook. This is a common means of communication that traders and collectors of Magic cards utilize. The parties' chats are fully preserved.

Mr. Ruggiero and Mr. Nocenti met in person again on May 7, 2017, at Mr. Nocenti's house, to review the collection Mr. Ruggiero was buying.

On May 9, 2017, Mr. Ruggiero advised Mr. Nocenti that he would be selling off part of his valuable collection to finance this deal. (FBM 7/4/17 10:45 p.m.-10:46 p.m.) Mr. Ruggiero sought Mr. Nocenti's advice on what price to ask for the cards he was selling and specifically stated that he was selling these cards in order to pay Mr. Nocenti for their deal. (FMB 5/28/17 10:47 a.m.-5/29/17 9:08 p.m.)

Based on the final version of the Excel sheet, the total contract price for the 143 Cards was $177,415.00, due to the extremely rare and irreplaceable value of the Magic Cards. The parties agreed that a very important aspect of the deal was that Mr. Ruggiero had to pay Mr. Nocenti $70,000.00 within the first year.

On May 29, 2017, Mr. Ruggiero sent Mr. Nocenti an email describing the types of cards Mr. Nocenti would hold while the deal was negotiated. In this email, Mr. Ruggiero stated he was "looking to purchase any and all Beta cards that meet this criteria." In this email, Mr. Ruggiero also acknowledged that Mr. Nocenti wanted $70,000.00 in the first year and advised that he would sell part of his own collection to finance the transaction.

Mr. Nocenti will argue that he never read this May 29, 2017 email. Even if this fact is significant (which is denied), the parties agreed to all the essential terms in writing over and over

within their Facebook chat. The following essential terms were agreed to in writing in the Facebook chat: 1) the list of "Magic" cards to be sold, based on the Excel sheet both parties prepared; 2) the price ($177,415.00 total, $70,000.00 to be paid within year one); and 3) the timeline, up to three years, but $70,000.00 to be paid by the end of June 2018. Although Mr. Nocenti only appears to argue the time of performance was not agreed upon, the time of performance terms were confirmed multiple times in the FBM chats. (*See, e.g.,* string of chats on 7/4/17.)

> For example, Mr. Ruggiero and Mr. Nocenti confirmed the timeline on 7/4/17:
>
>> Mr. Nocenti 10:42 "Hi Mike, not trying to push you buy [sic] realistically what do you think we're looking at on our timeline for the pile of betas?"
>>
>> Mr. Ruggiero 10:43 p.m. "Not at all… let's make sure we are super clear and on the same page. do you feel that I didn't delineate my plan clearly?"
>>
>> Mr. Nocenti 10:44 p.m. "I know we had talked about 1, 2 and 3 year options just didn't know which we were targeting for or if we were leaving it open ended."
>>
>> Mr. Ruggiero 10:44 p.m. "Gotcha…makes sense. So as we've discussed, I think much of that depends on what sells of mine."
>>
>> Mr. Nocenti 10:45 p.m. "that is correct."
>>
>> Mr. Ruggiero 10:45 p.m. "I will make sure you get $70k with in [sic] the next 12 months."
>>
>> …
>>
>> Mr. Nocenti: 10:46 p.m. "Thank you for clearing this up for me."

Mr. Ruggiero started his payments in June 2017. Mr. Nocenti never pressured Mr. Ruggiero to speed up payment prior to Mr. Nocenti's breach in May 2018. As an example, on June 15, 2017, Mr. Nocenti wrote to Mr. Ruggiero: "Keep your health in good shape we'll hopefully get the payments rolling soon… Your health is the most important take care of

yourself the cards will be here." (FBM 6/15/2017 12:39 p.m.; 12:48 p.m.) On June 20, 2017, Mr. Nocenti wrote to Mr. Ruggiero: "Hope you feel better. I know we were planning on starting payments this month [June] let's move it to next month if that's better for you." (FBM 6/20/2017 11:15 a.m.)

Mr. Ruggiero sent Mr. Nocenti an initial $5,000.00 payment on **June 26, 2017**. June 26, 2017 was the start date for the payments – a fact that would be confirmed multiple times in writing. (FBM 6/26/17 7:07 p.m.; 9:42 p.m.; 10:11 p.m. (emphasis added).)

On June 28, 2017, Mr. Ruggiero stated that he intended to make frequent payments within the first year and stated: "It is important to me that you feel secure and confident in our dealings. If you would [sic] a larger payment and/or in a shorter time frame, please don't hesitate to let me know and I will accommodate." (FBM 6/28/17 10:42 a.m.)

In late June 2017, the parties reaffirmed the timeline of $70,000.00 due within the first year, and up to three years to pay the total amount. On July 4, 2017, Mr. Ruggiero stated in writing that he would be sure to pay $70,000.00 within one year and would try to pay the full amount of $177,415.00 in one year if he was able to. (FBM 7/4/17 10:45-46 p.m.)

On July 4, 2017, Mr. Nocenti replied: "Thank you for clearing this up for me." (FBM 7/4/17 10:46 p.m.) That same day, Mr. Ruggiero followed up and asked: "Do you need a certain amount of money from me by a certain time?" to which Mr. Nocenti replied: "no just trying to see where I'm going to be so I can plan accordingly…The plan we have gives me the breathing room I needed in order to agree to it." (FBM 7/4/17 10:46; 10:49; 10:52 p.m.)

On July 27, 2017, Mr. Ruggiero made another $5,000.00 payment. On August 15, 2017, Mr. Ruggiero made another $5,000.00 payment.

On August 25, 2017, Mr. Ruggiero asked if he could begin to pick up some cards when he paid $30,000.00. Mr. Nocenti replied, "sounds like a plan." (FBM 8/25/17 1:53 p.m.) Once Mr. Ruggiero hit the $30,000.00 mark, Mr. Nocenti did not give him any cards as promised.

On September 26, 2017, Mr. Ruggiero made another $5,000.00 payment.

On October 7, 2017, Mr. Ruggiero advised that he would not be able to pay the **full** contract price of $177,415.00 within one year. (FBM 10/7/17 12:43 p.m.)

On October 30, 2017, again Mr. Ruggiero confirmed over and over that Mr. Nocenti was comfortable with their payment schedule. Mr. Nocenti was. Mr. Nocenti stated "as long as I have what I need to get my project started **I honestly could care less**." (FBM 10/30/17 12:50 p.m. (emphasis added).)

On January 23, 2018, Mr. Nocenti asked Mr. Ruggiero if he was still able to make the $70,000 payment by the end of June 2018. He asked: "Just wanted to make sure we are on track for **June** [2018]…I'm planning on starting my home project in late April or May [2018] so this will line up nicely." Mr. Ruggiero replied: "yes indeed." (FBM 1/23/18 12:14 p.m.; 1:24 p.m. (emphasis added).)

On February 1, 2018, Mr. Ruggiero paid another $5,000.00.

In March 2018, the parties discussed, but ultimately did not agree to, extending the deadline to make the first-year payments by one month. On March 18, 2018, Mr. Ruggiero asked: "We started our payments on June 26th, so I'm asking if the additional month works with your plans?" Mr. Nocenti said it was "doable," but ultimately Mr. Ruggiero did not require the additional time. He stated: "You want $70k by the **end of june** [sic] and that will work best for you?" Mr. Nocenti unequivocally replied: "**That would be perfect**." Mr. Ruggiero stated, "Ok,

-5-

very good." (FBM 3/18/18 10:20 a.m.; 10:22 a.m.; 10:25 a.m.; 10:26 a.m.; 10:28 a.m. (emphasis added).)

On March 19, 2018, Mr. Ruggiero paid another $5,000.00. On April 10, 2018, Mr. Ruggiero paid another $5,000.00. On May 18, 2018, Mr. Ruggiero paid another $5,000.00.

On May 5, 2018, Mr. Nocenti acknowledged how much the price of the Cards that were the subject of their deal have been increasing in value. (FBM 5/5/18 9:25 p.m.)

On May 18, 2018, Mr. Ruggiero said that he was on track to pay the initial $70,000.00 by the **end of June**. Mr. Nocenti replied: "ty [thank you] Mike." (FBM 5/18/18 7:53 a.m.)

Then, abruptly, just 11 days later, on May 29, 2018, Mr. Nocenti stated to Mr. Ruggiero that his deadline to pay the initial $70,000.00 was "past due" and due to this he was going to refund the money paid and cancel the contract. (FBM 5/19/18 2:15 p.m.; 2:16 p.m.)

Mr. Ruggiero emailed Mr. Nocenti the same day advising that the one year was not expired until the end of June, but nonetheless, offering to pay the balance to reach $70,000.00 that day. Mr. Nocenti wrote back stating that he believed the contract began on May 7, 2017, and any changes were not "official." (*Id.*)

Mr. Nocenti testified that he reneged on the contract the same day that he was informed that Mr. Ruggiero bought a Magic: the Gathering Card from Adam Cai. (Def.'s Dep. 127:15-129:9.) Mr. Nocenti will likely argue at trial that no contract existed but will likely simultaneously argue that Mr. Ruggiero breached the agreement by buying this card from another seller. However, there is absolutely no term in the parties' agreement which precluded Mr. Ruggiero from buying other cards. Indeed, Mr. Ruggiero told Mr. Nocenti he was considering buying this exact card and Mr. Nocenti actually *encouraged* Mr. Ruggiero by telling him it was a good price. (FBM at 7/1/17 at 8:08 p.m.).

In a showing of good faith, having already paid $40,000.00 to date, Mr. Ruggiero sent Mr. Nocenti the remaining $30,000.00 (plus transaction fees – paid by Mr. Ruggiero), totaling $70,000.00 paid by May 29, 2018, over one month prior to actual expiration of the first $70,000.00 coming due.  Mr. Nocenti refunded Mr. Ruggiero the $70,000.00 that same day.

Mr. Nocenti testified in his deposition that he sold some of the subject cards to other buyers for cash, and during this deal worth over $100,000, he doesn't know the buyers last names, their contact information, and has no record of the payment or sale (Def.'s Dep. 225:13-229:15.)

The elemental aspects necessary to give rise to an enforceable contract are "offer," "acceptance," "consideration" or "mutual meeting of the minds." *Schreiber v. Olan Mills*, 426 Pa. Super. 537, 541, 627 A.2d 806, 808 (1993).  Here, there was an offer from Mr. Nocenti to sell to Mr. Ruggiero 143 BGS Graded Beta Edition Magic: The Gathering Cards for the price of $177,415.00 and an acceptance of this offer by Mr. Ruggiero.

A valid contract existed because there was an offer to sell the subject Magic Cards, acceptance of the offer, and consideration ($40,000.00 paid to Mr. Nocenti over the first 11 months).  Mr. Nocenti breached the parties' contract when he reneged on May 29, 2018.  A breach of contract action involves (1) the existence of a contract, (2) a breach of a duty imposed by the contract, and (3) damages. *J.F. Walker Co., Inc. v. Excalibur Oil Group, Inc.*, 792 A.2d 1269 (Pa. Super. 2002).  Here, a valid bilateral contract existed to sell the subject Cards for $177,415.00, with $70,000.00 to be paid by June 26, 2018, and some cards to be delivered to Mr. Ruggiero after $30,000.00 was paid.  Mr. Nocenti reneged on this contract.  As a result, Mr. Ruggiero has suffered significant and irreparable damages from the breach, including but not limited to: 1) Mr. Ruggiero sold off his own priceless collection in order to finance the

transaction with Mr. Nocenti (and Mr. Nocenti even aided in this process); 2) Mr. Ruggiero will not be able to obtain this specific collection of 143 Magic Cards from any other source; 3) Mr. Ruggiero lost out on significant investments when he sold off his own cards in 2017-2018; and 4) Mr. Ruggiero lost out on significant investments from the completion of the instant Agreement with Mr. Nocenti. These damages are confirmed in Mr. Ruggiero's expert reports, both for the lost investment from the time of the contracting to the time of breach and the lost value of the cards he sold to finance this transaction.

On June 8, 2018, Plaintiff's counsel sent Defendant a letter directing Defendant not to sell the Cards that are the subject of this case as same would constitute the spoliation of evidence. Mr. Nocenti testified that he received this letter, but nonetheless, after receiving the letter he decided to sell a large portion of the subject Cards for about $100,000.

Following summary judgment, the remaining counts in Plaintiff's complaint are: Counts I (Breach of Contract), III (Contract Implied in Fact), VI (Promissory Estoppel), VII (Fraud/Fraud in the Inducement), and VIII (Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL")). Plaintiff believes the above conduct will entitle Plaintiff to damages under these causes of action.

## II.     WITNESSES TO BE CALLED AT TRIAL:

### A.     Michael Ruggiero:

Plaintiff, Michael Ruggiero, will testify about the transaction at issue as detailed above. Specifically, Mr. Ruggiero will testify that the parties agreed to the terms of the contract and that Mr. Nocenti reneged on the agreement on May 29, 2018.

### B.     Brian Nocenti

Defendant, Brian Nocenti, will testify about his statements to Mr. Ruggiero, his promises and his representations. Mr. Nocenti will also testify about his spoliation of the cards at issue.

Plaintiff will request that Mr. Nocenti bring his tax returns to trial for the year in which he testified that he sold some of the subject cards for $100,000.

### III. EXPERT WITNESSES TO BE CALLED AT TRIAL:

#### A. Travis Landry:

Travis Landry is a damages expert. He will testify about the value of the Cards at the time of the breach and at various times including February 2021. He will also testify about the lost investment for the cards that Mr. Ruggiero sold to finance the transaction. He will also testify generally about Magic cards and their collectability and value.

#### B. Nick Coss:

Nick Coss is a damages expert. He will testify about the value of the Cards at the time of the breach and at various times including February 2021. He will also testify about the lost investment for the cards that Mr. Ruggiero sold to finance the transaction. He will also testify generally about Magic cards and their collectability and value.

The CVs for Mr. Landry and Mr. Coss, respectively, are attached as Exhibit A.

### IV. DAMAGES

Money damages are sought as well as specific performance of the contract to the extent there are any remaining subject Cards that have not been sold despite the litigation hold letter.

The contract price was $177,415.00 for the subject cards. Mr. Ruggiero sold his cards to finance the transaction for $62,592.00 in 2017 and early 2018. In the Court's January 1, 2021 Order [Doc. No. 41], the Court noted that "the Magic Cards' value after May 2018 [the time of breach] is relevant to prove Mr. Ruggiero's alleged damages because his expectation as to the value was not only the purchase price of the Magic Cards but also their appreciation value over time."

Expert Nick Coss valued the subject cards at a price of $305,500.00 in May 2018 (the time of breach).  The difference between $305,547.00 (value at time of breach of contract) and $177,415.00 (agreed upon contract price) is $128,132.00.   Mr. Coss also updated his valuation in early February 2021; the current value is $668,100.00.  The difference between $668,100.00 (value in February 2021) and $177,415.00 (agreed upon contract price) is $490,685.00.

Mr. Coss values the cards that Mr. Ruggiero sold to others to finance the transaction to be $92,806.00 in May 2018 (time of breach of contract).  In 2019, the cards Mr. Ruggiero sold to finance the transaction were worth approximately $153,355.00 ($153,355.00 – $62,592.00 = $90,763.00 loss).  Mr. Coss also updated his valuation on the cards Mr. Ruggiero sold in early February 2021; the current value is $202,580.00.  The difference between $202,580 and $62,592.00 (price they were sold for) is $139,998.00.

Mr. Landry's values are very similar.  Mr. Landry also updated his valuation in early February 2021.  Both supplemental expert reports were provided to Plaintiff.

Thus, the total economic damages are $490,685.00 (breach of contract) + $139,998.00 (promissory estoppel) = **$630,683.00.**

Plaintiff will also seek damages for its fraud and UTPCPL claims, including attorneys' fees.  Additionally, if spoliation is established at trial, Plaintiff will also seek sanctions and costs such as reasonable counsel fees.

V.   **STIPULATIONS**

The parties' stipulations are attached hereto as Exhibit B.

VI.  **TRIAL EXHIBITS**

The parties have conferred on the trial exhibits and Plaintiff does not have any objections.

## VII. DEPOSITION TESTIMONY

There is no video testimony in this case. Plaintiff designates the following pages and lines from Mr. Nocenti's deposition testimony:

97:8-12

114:13-18

128-21 -129:9

132-21-134:3

136:2-13

142:24-143:5

144:4-145:20

152:15-22

164:2-23

170:12-171:6

175:5-25

178:7-24

181:8-182:18

186:15-25

187:7-11

191:1-192:3

198:2-11

211:8-24

216:14-222:20

227:6-16

232:23-233:13

233:21-234:13

235:20-237:5

241:25-244:4

**VIII.   EVIDENCE**

At this time, the Plaintiff is not aware of any dispute as to the admissibility of evidence.

**IX.   LEGAL ISSUES**

Since the filing of the last pre-trial memorandum, the Court has resolved the motions *in limine*. There is a remaining issue of spoliation which the Court denied without prejudice. [Doc. No. 42.]

Thus, Plaintiff anticipates that the Court will only have to additionally resolve the remaining counts in Plaintiff's Complaint: Counts I (Breach of Contract), III (Contract Implied in Fact), VI (Promissory Estoppel), VII (Fraud/Fraud in the Inducement), and VIII (Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL")).

Date:  February 18, 2021            Respectfully submitted,

By:  s/ *Alexandra S. Jacobs*
John J. Levy (PA ID No. 42377)
Alexandra S. Jacobs (PA ID No. 318355)
MONTGOMERY, MCCRACKEN, WALKER & RHOADS, LLP
A Pennsylvania Limited Liability Partnership
457 Haddonfield Road
Cherry Hill, NJ  08003
Email: ajacobs@mmwr.com
*Attorneys for Plaintiff, Michael Ruggiero*