**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MICHAEL RUGGIERO, | : | CIVIL ACTION NO. 18-cv-3047-JHS |
| | : | |
| Plaintiff, | : | JURY TRIAL DEMANDED |
| | : | |
| v. | : | |
| | : | |
| BRIAN NOCENTI and JOHN DOES 1-5, | : | |
| | : | |
| Defendants. | : | |

**PLAINTIFF'S PROPOSED
<u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>**

-i-

# TABLE OF CONTENTS

**Page**

PROPOSED FINDINGS OF FACT ........................................................................ 1

   "Magic: the Gathering" Background ...................................................... 1

   Professional Grading of MtG Cards ....................................................... 1

   The Parties ................................................................................................ 2

   The Contract between Plaintiff and Defendant...................................... 3

   Payment Terms ........................................................................................ 4

   Payments made by Plaintiff to Defendant ............................................. 6

   Early May 2018: as the First Year of the Contract Comes to an End, Defendant Observes the Price Increases on the Collection ...................................... 7

   Late May 2018: Defendant Discussed with a Third-Party his Plans to Back out of the Deal ........................................................................................................ 7

   Defendant "Cancels the Agreement" Claiming "Breached of the Agreement" by Plaintiff .................................................................................................... 9

   May 29, 2018:  Plaintiff Pays Early the Balance for a Total of $70,000 ................................ 9

   The Parties Discuss Defendant's Abrupt Termination of the Agreement .............................. 9

   Defendant Tries to Come up with Another Excuse:  The Sapphire Purchase ....................... 10

   Keeping the Defendant Informed Was a Priority for Plaintiff............................................... 10

   Plaintiff Was Encouraged and Aided by Defendant to Sell his Own MtG Cards to Finance the Transaction with Defendant .................................................... 11

   Both Parties and their Expert Witnesses Viewed Graded MtG Beta Cards as an Investment................................................................................................. 12

   It Would Have Taken Plaintiff a Period of Time to Re-sell Defendant's Collection if he Obtained it in June 2020 .................................................... 15

   In May 2018, the Collection of MtG Cards Defendant Agreed to Sell was not Replaceable as a Collection or Piecemeal ........................................... 16

   Plaintiff Suffered an Additional Loss by Selling his Own MtG Cards to Finance the Transaction Defendant Reneged On ................................... 17

   July 2018:  Defendant Supposedly Sold his Collection to Unknown Buyers in a Parking Lot for Cash, with No Receipts or Records of the Sale............................................ 17

   The Credibility of Defendant's Testimony ......................................................................... 18

   Plaintiff's Expert, Mr. Coss, Provided Valuations of the MtG Cards with Reasonable Certainty................................................................................ 20

## TABLE OF CONTENTS
(continued)

Page

Plaintiff's Expert, Mr. Landry, Provided Valuations of the MtG Cards  with
Reasonable Certainty ................................................................................ 21

Plaintiff's Experts Did Not Confer in Any Way The Consistency of Their
Independent Valuations Adds to the Credibility of Their Methodologies and Opinions ...... 23

Defendant's Expert, Mr. Bruso, is Well Qualified, but Some His Valuations Were
Suspect ..................................................................................................... 23

PROPOSED CONCLUSIONS OF LAW ................................................................. 27

Count I – Breach of Contract .............................................................................. 27

Non-material Breach ......................................................................................... 30

Count VII – Fraud in the Inducement .................................................................... 31

Count VIII - Pennsylvania Unfair Trade Practices and Consumer Protection Law .............. 31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aircraft Guar. Corp. v. Strato-Lift, Inc.*,
991 F. Supp. 735 (E.D. Pa. 1998) ........................................................28

*ATACS Corp. v. Trans World Commc'ns, Inc.*,
155 F.3d 659 (3d Cir. 1998)...........................................................29, 30

*Dardovitch v. Haltzman*,
190 F.3d 125 (3d Cir. 1999)..............................................................27

*Delahanty v. First Pa. Bank, N.A.*,
318 Pa. Super. Ct. 90, 120, 464 A.2d 1243 (1983).............................29

*Dibish v. Ameriprise Financial, Inc.*,
134 A.3d 1079 (Pa. Super. 2016) .......................................................32

*Dixon v. Northwestern Mutual*,
146 A.3d 780 (Pa. Super. Ct. 2016) ...................................................32

*Dunkin' Donuts Franchised Restaurants, LLC v. Claudia I, LLC*,
998 F. Supp. 2d 383 (E.D. Pa. 2014) ..................................................31

*Ecore Int'l, Inc. v. Downey*,
343 F. Supp. 3d 459 (E.D. Pa. 2018) ..................................................29

*Gen. Dynafab, Inc. v. Chelsea Indus., Inc.*,
447 A.2d 958 (Pa. Super. 1982).........................................................28

*Glenn Distributors Corp. v. Carlisle Plastics, Inc.*,
297 F.3d 294 (3d Cir. 2002)..............................................................28

*Goldstein v. Murland*,
2002 WL 1371747 (E.D. Pa. June 24, 2002) ......................................31

*Gregg v. Ameriprise Fin., Inc.*,
No. 29 WAP 2019, 2021 WL 607486 (Pa. Feb. 17, 2021).....................32

*Int'l Diamond Imp., Ltd. v. Singularity Clark, L.P.*,
40 A.3d 1261 (Pa. Super. Ct. 2012) ...................................................30

*Knight v. Springfield Hyundai*,
81 A.3d 940 (Pa. Super. Ct. 2013) .....................................................32

-iii-

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Kunststoffwerk Alfred Huber v. R.J. Dick*,
    621 F.2d 560 (3d Cir. 1980) .................................................................30

*Legendary Art, LLC v. Godard*,
    888 F. Supp. 2d 577 (E.D. Pa. 2012) .....................................................29

*McCausland v. Wagner*,
    78 A.3d 1093 (Pa. Super. Ct. 2013) .......................................................30

*Mobile Conversions, Inc. v. Allegheny Ford Truck Sales*,
    No. 2:12-CV-1485, 2014 WL 7369898 (W.D. Pa. Dec. 29, 2014) ........28

*Nat'l Controls Corp. v. Nat'l Semiconductor Corp.*,
    833 F.2d 491 (3d Cir. 1987) ..................................................................28

*Neville Chemical Co. v. Union Carbide Corp.*,
    422 F.2d 1205 (3d Cir.), *cert. denied*, 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d
    55 (1970) ................................................................................................30

*Quandry Sols. Inc. v. Verifone Inc.*,
    No. 07-097, 2009 WL 997041 (E.D. Pa. Apr. 13, 2009) ........................29

*Shahid v. Borough of Darby*,
    560 F. App'x 152 (3d Cir. 2014) ............................................................27

*Slapikas v. First Am. Title Ins. Co.*,
    298 F.R.D. 285 (W.D. Pa. 2014) ............................................................32

*In re Tayfur*,
    599 F. App'x 44 (3d Cir. 2015) ..............................................................27

*Widmer Eng'g, Inc. v. Dufalla*,
    837 A.2d 459, 468 Pa. Super. Ct. 2003 ..................................................30

**Statutes**

73 P.S. §201-9.2 ...........................................................................................31

28 U.S.C. §1332(a)(1) ...................................................................................27

28 U.S.C. §1391(b)(2) ...................................................................................27

Pennsylvania UCC Section 2204(a) ..............................................................27

Pennsylvania UCC Section 2204(b) ..............................................................27

**TABLE OF AUTHORITIES**
(continued)

Page(s)

Pennsylvania UCC Section 2204(c) ................................................................................27

Pennsylvania UCC Section 2209 ...................................................................................31

Pennsylvania UCC Section 2301 ...................................................................................27

Pennsylvania UCC Section 2713 ...................................................................................28

Pennsylvania UCC Section 2715 ...................................................................................28

Pennsylvania UCC Section 2716 ...................................................................................28

<u>Pennsylvania Unfair Trade Practices and Consumer Protection Law</u> ..........................31

Pennsylvania Unfair Trade Practices and Consumer Protection Law ..........................31

**Other Authorities**

Black's Law Dictionary (11th ed. 2019) ........................................................................26

Fed. R. Civ. P. 52(a) .....................................................................................................27

Fed. R. Civ. P. 52(a)(6) .................................................................................................27

**PROPOSED FINDINGS OF FACT**

**Magic: the Gathering" Background**

1.     "Magic: the Gathering" ("MtG") is a collectible card game released in 1993 by a game publishing company called Wizards of the Coast.  (4/5/21 Trial Transcript at 15:13-16:2 (M. Ruggiero)).

2.     Wizards of the Coast published MtG cards in sets, also known as editions.  New sets were released every year thereafter, usually four times per year.  (4/5/21 Trial Transcript at 16:20-17:8 (M. Ruggiero)).

3.     The first edition of MtG cards ever released was called the "Limited Edition" which was released in 1993 in two print runs: Alpha, and then Beta.  The Beta print run contained 302 cards in total.  (4/5/21 Trial Transcript at 16:20-17:17 (M. Ruggiero)).

4.     Beta cards have square corners and black borders. (4/5/21 Trial Transcript at 18:6-15 (M. Ruggiero)).

5.     Wizards of the Coast only printed Beta cards in 1993, so the only Beta cards that exist in the world today were printed that year.  (*Id.* at 20:2-4.)

6.     As a result, Beta cards today can only be purchased on the secondary market from people willing to sell these cards printed in 1993.  (4/5/21 Trial Transcript at 20:5-12 (M. Ruggiero)).

7.     Beta cards are extremely valuable to collectors. (4/5/21 Trial Transcript at 197:3-4 (T. Landry) (opining that Beta edition is the "holy grail" for MtG collectors)).

8.     Today, the game "Magic: the Gathering" attracts millions of players worldwide.  (4/5/21 Trial Transcript at 126:7-15 (N. Coss)).  Some players compete professionally in tournaments. (4/5/21 Trial Transcript at 197:5-17 (T. Landry) ("*you could be a professional magic player, no different than Tom Brady is a professional QB in the NFL.   It's a worldwide phenomenon.*")).

**Professional Grading of MtG Cards**

9.     MtG cards, like other collectible cards, can be submitted for professional card grading.  Beckett Grading Services ("BGS") is a professional card-grading company that determines the authenticity of a card and assigns an overall grade of the quality or condition of the card. BGS also assigns four subgrades to a card's condition for the categories of centering, corners, edges and surface.  The grades are in integers of 0.5.  Ten is the highest grade and one is the lowest grade.  The subgrades, considered together, inform the overall grade, or condition, of the card.  (4/5/21 Trial Transcript at 18:6-19:12 (M. Ruggiero)).

10.     When BGS grades a card, it encapsulates it in a hard, clear-plastic box and assigns it a unique serial number. (4/5/21 Trial Transcript at 164:25-165:18 (N. Coss)).

11.     In the context of BGS grading, the term "quad" before the grade denotes that none of the four subgrades are lower than the overall grade.  For example, if a card is referred to as a "quad 9.5" that means that all four subgrades are, at minimum, graded 9.5.  The term "plus" means that one of the subgrades is a 10.  Thus, if a card is referred to as a "quad 9.5 ++" it means the subgrades of the card are 9.5, 9.5, 10 and 10.  (4/5/21 Trial Transcript at 21:20-22:11 (M. Ruggiero)).

12.     Professionally graded cards are not intended to be played within a game or tournament; they are professionally graded for purposes of collecting and investment.  (4/5/21 Trial Transcript at 127:15-25 (N. Coss)).

**The Parties**

13.     Plaintiff, Michael Ruggiero, is a licensed family and child therapist residing in Morganville, New Jersey.  (4/5/21 Trial Transcript at 14:12-21 (M. Ruggiero)).

14.     Plaintiff is employed full time by "Total Family Solutions" and works in the homes of families who have children with behavioral and emotional problems.  (4/5/21 Trial Transcript at 14:20-15:12 (M. Ruggiero)).

15.     Shortly after MtG was released in 1993, Plaintiff, then between 14-15 years old, began playing the game every day with friends.    (4/5/21 Trial Transcript at 16:3-19 (M. Ruggiero)).

16.     Around 2007, Plaintiff began collecting MtG cards, and his focus was on collecting the Beta edition cards that were professionally graded 9.5 and higher.  Plaintiff focused on the Beta edition because the Alpha edition was not originally permitted to be used in tournaments, and he considered Beta to be a better financial investment.  (4/5/21 Trial Transcript at 20:13-21:14 (M. Ruggiero)).

17.     Plaintiff collects professional graded MtG cards, particularly the Beta edition, as his retirement fund, and uses this collecting as his primary source of personal investment.  (4/5/21 Trial Transcript at 23:6-15 (M. Ruggiero)).

18.     Plaintiff and Defendant met briefly at a MtG tournament in 2014, and following this meeting they began to converse on a chat feature on Facebook known as "Facebook Messenger." (4/5/21 Trial Transcript at 24:19-25:4 (M. Ruggiero)).

19.     In September 2015, Defendant served as a middleman in a transaction where Plaintiff was buying a valuable card from another seller.  Defendant held the card until Plaintiff paid in full for the card.  (4/5/21 Trial Transcript at 26:10-21 (M. Ruggiero)).

20.     In February 2017, Plaintiff reached out to Defendant again on Facebook Messenger to discuss the possibility of Defendant selling Plaintiff a Beta edition "Black Lotus" card that was graded 9.5 Quad++.  (4/5/21 Trial Transcript at 27:3-18 (M. Ruggiero)).  Defendant noted that this card was expensive due to the fact that it had two subgrades of 10.  (*Id.*).

21.     The Black Lotus is the most iconic card in the Beta set. (4/5/21 Trial Transcript at 131:20-21 (N. Coss); 4/6/21 Trial Transcript at 209:2-4 (J. Bruso)).

-2-

**The Contract between Plaintiff and Defendant**

22.    On March 11, 2017, Plaintiff and Defendant met at Defendant's home where the Defendant showed Plaintiff his collection of professionally graded MtG, Beta edition cards. Defendant wanted to sell his collection of Beta Magic cards and Plaintiff was interested in purchasing them.  Plaintiff inspected the cards and the parties discussed their estimated fair market value.  (4/5/21 Trial Transcript at 28:2-13 (M. Ruggiero)).

23.    In the weeks that followed their first meeting, the parties began to negotiate what cards in the Defendant's collection Plaintiff would buy, and at what price the Defendant would sell them to him.  Defendant sent Plaintiff an Excel list of cards that were being discussed for sale and proposed an initial price of $190,000 for the collection of cards.  (4/5/21 Trial Transcript at 28:2-25 (M. Ruggiero)); (4/6/21 Trial Transcript at 72:9-12 (B. Nocenti) (At trial, Defendant was shown Trial Exhibit P8 and he testified "*I sent – I believe I sent Mr. Ruggiero a list, similar to this* [P8], *and we had – he was trying to negotiate certain prices down and so forth.  Sometime I believe in May this was sent to him*.")).

24.    The parties discussed that Defendant would permit Plaintiff up to three years to pay for the collection if he was purchasing at least $150,000 worth of cards. (4/5/21 Trial Transcript at 29:2-17 (M. Ruggiero)).

25.    The parties met again at Defendant's home on May 7, 2017.  At the second meeting, Plaintiff brought some of the cards he would sell to fund the deal with Defendant.  (4/5/21 Trial Transcript at 31:1-15 (M. Ruggiero)); (Stipulation No. 6).

26.    Defendant estimated that the 2017 value of the cards Plaintiff intended to sell to finance their transaction was $100,000-$120,000.   (4/6/21 Trial Transcript at 80:15-18 (B. Nocenti)).

27.    Plaintiff did not see any cards in the collection after the second in-person meeting on May 7, 2017.  (4/5/21 Trial Transcript at 45:17-20 (M. Ruggiero)).

28.    On May 28, 2017, Defendant asked Plaintiff to send him an email confirming the cards he was committed to purchasing.  (4/5/21 Trial Transcript at 31:16-32:13 (M. Ruggiero)). Plaintiff sent Defendant an email (Trial Exhibit P1) the following day, May 29, 2017.

29.    Trial Exhibit P1, Plaintiff's May 29, 2017 email, describes the cards Plaintiff would purchase from Defendant and records that Defendant required Plaintiff to pay $70,000 toward the purchase price of the collection within the first year.  (4/5/21 Trial Transcript at 31:16-32:13 (M. Ruggiero)); Trial Exhibit P1.

30.    The parties finalized the Excel list of cards Plaintiff was interested in purchasing. Trial Exhibit P8, Bates number Ruggiero 0096-98, is the list of 143 professionally graded Beta MtG cards Defendant agreed to sell to Plaintiff.  (Stipulation No. 3); (4/5/21 Trial Transcript at 32:14-34-19 (M. Ruggiero)).

31.     The list of cards in Trial Exhibit P8 contains five of the nine most powerful and valuable cards in the Beta set, called the "Power 9." All five of the "Power Nine" cards in the collection are of an "extremely high grade." (4/21/21 Trial Transcript at 58:22-24 (J. Bruso)). An additional 30 cards within the collection are known as "Rare" cards (*Id.* at 59:12-25). Of all the cards on the Excel list, five are graded perfect BGS 10s, 125 are BGS 9.5s, six are graded BGS 9s, and none are graded below a BGS 9.0. (*Id.* at 60:17-19); *see also* 4/5/21 Trial Transcript at 197:21-198:2 (T. Landry)) ("*A. The cards on P57A have all been professionally graded by Beckett grading services on top of them being just Beta rated Magic: The Gathering Cards. They are the highest level or one of the highest levels, condition-wise. These are some of the greatest cards you could expect condition-wise on the marketplace. They are some of the top tier cards you would find*.")

32.     The Excel list at Trial Exhibit P8 contains the name of each card in the 143-card collection, each card's unique BGS serial number, each card's BGS grade, and the total contract price for the collection of $177,416. (Stipulation Nos. 4-5); (4/5/21 Trial Transcript at 32:14-34-19 (M. Ruggiero)).

33.     Defendant offered to sell to Plaintiff his collection of the 143 cards listed on P8. The Excel list at Trial Exhibit P8 was not a list of single cards Plaintiff had the option of picking and choosing which one he wanted to buy; rather it was a collection of 143 cards that Defendant offered to sell to Plaintiff for $177,415. (4/5/21 Trial Transcript at 33:5-16 (M. Ruggiero)). *See also*, 4/6/21 Trial Transcript at 134:16-19 (B. Nocenti):

> Q.     Okay. So ultimately you and Mr. Ruggiero negotiated and you offered to sell him the collection for $177,415, right?
>
> A.     If everything on that list is correct, yes.

**Payment Terms**

34.     Defendant required Plaintiff to pay $70,000 towards the overall purchase price of the collection by the end of the first year. Defendant allowed Plaintiff two more years to pay the remainder. (4/5/21 Trial Transcript at 35:11-14 (M. Ruggiero)).

35.     The parties confirmed in writing on numerous occasions that Plaintiff was required to pay the first $70,000 of the $177,415 purchase price for the collection by "the end of June 2018."

- July 4, 2017 message from Plaintiff 10:45 p.m. "*I will make sure you get $70k with in [sic] the next 12 months.*" (Trial Exhibit P7, Ruggiero 00037, Facebook Messenger Chat ("FBM") 7/4/17 10:45-46 p.m.)

- On January 23, 2018, Defendant asked Plaintiff if he was still able to make the $70,000 payment by the end of June 2018. He wrote: "*Just wanted to make sure we are on track for **June** [2018] ... I'm planning on starting my home project in late April or May [2018] so this will line up nicely.*" Plaintiff replied: "*yes indeed*." (Trial Exhibit P7, Ruggiero 00020, FBM 1/23/18 12:14 p.m.; 1:24 p.m. (emphasis added)).

- In March 2018, the parties discussed, but ultimately did not agree to, extending the deadline to make the first-year payments by one month. On March 18, 2018, Plaintiff asked: "*We started our payments on June 26th, so I'm asking if the additional month works with your plans?*" Defendant said it was "*doable*," but ultimately Plaintiff did not take any additional time. He wrote: "*You want $70k by the end of June and that will work best for you?*" Defendant unequivocally replied: "***That would be perfect.***" Plaintiff stated, "*Ok, very good.*" (Trial Exhibit P7, Ruggiero 00016, FBM 3/18/18 10:20 a.m.; 10:22 a.m.; 10:25 a.m.; 10:26 a.m.; 10:28 a.m. (emphasis added)).

- On May 5, 2018, Defendant said, "*June is fast approaching. Wanted to see what you were thinking on the June payment. **Due to the price increases lately on Beta cards I need to stick to our June Timeline**.*" (Ruggiero 00016, FBM 5/5/18 at 9:24 p.m. (emphasis added)). Plaintiff confirmed they were on track: "*Hi Brian, we are on track as planned. I'll be sending $10k in a week or two. And the remaining $25k by **the end of June**.*" (Ruggiero 00016, FBM 5/5/18 at 9:25 p.m. (emphasis added)). Then Defendant added that he was "*trying to figure out how to pull everything off in a timely matter*" (Ruggiero 00016, FBM 5/5/18 at 9:26 p.m.) to which Plaintiff asked "*for the new home yes?*" which Defendant confirmed, "*yes.*" (Trial Exhibit P7 Ruggiero 00015-6, FBM 5/5/18 at 9:27 p.m.)

- On May 18, 2018, Plaintiff said that he was on track to pay the initial $70,000.00 by the **end of June**. Plaintiff stated to Defendant: "*Good morning Brian. Just a quick update on payments. I sent yonu [sic] $5k now. Another payment of $10-15K will be coming your way at the end of this month. And we'll get a total of $70k by the end of June.*" Defendant replied: "*ty [thank you] Mike.*" (Trial Exhibit P7, Ruggiero 00013, FBM 5/18/18 7:53 a.m. (emphasis added)).

36.     As far as the timing of payments within in the first year, Plaintiff was only required to pay $70,000 by the end of June 2018.

> Q.     Did you ever establish a timeline for when payments would be made inside the first year?
>
> A.     No.

(4/6/21 Trial Transcript at 94:15-17 (B. Nocenti)); *see also* 4/5/21 Trial Transcript at 42:8-19 (M. Ruggiero) ("*you will see throughout the entire chat, I think it was three or four times that I had proactively brought up the idea of payments. When he wants them, how much does he want them, and confirming that $70,000 is what he expected to be paid by the end of June. And each time he would acknowledge that we were on the same page and that he was happy and content with our understanding.*"); *see also* (4/5/21 Trial Transcript at 84:1-4 (M. Ruggiero)) ("*A. There was [sic] no attempts to necessarily on his part to reach an agreement other than he repeatedly said, he was in no rush as long as I was able to pay him $70,000 by the first year.*").

37.     Other than requiring that $70,000 be paid by the end of June 2018, Defendant did not require specific payments to be made by certain dates within year one. (4/6/21 Trial Transcript at 83:6-10 (B. Nocenti)).

- For example, on October 30, 2017, Plaintiff confirmed again that Defendant was comfortable with their payment schedule. Defendant stated, "*as long as I have what I need to get my project started **I honestly could care less**.*"  (Trial Exhibit P7, FBM 10/30/17 12:50 p.m. (emphasis added)).

- Defendant anticipated that after the first year of payments were concluded, he and Plaintiff would meet again to talk about the timing of payments beyond year 1.  (4/6/21 Trial Transcript at 108:18-110:3 (B. Nocenti)).

38.     Defendant made Plaintiff aware that the June 2018, $70,000 payment deadline revolved around Defendant's desire to partially pay a builder for the construction of his million-dollar home.  (4/5/21 Trial Transcript at 42:20-43:1 (M. Ruggiero)).

39.     Defendant confirmed to Plaintiff in writing that Plaintiff had three years to pay the full $177,415 purchase price of the collection.  Specifically, on June 28, 2017, Defendant confirmed in writing that he and Plaintiff had "*stamped out a three year plan.*"

> Q.     … on June 28th, 2017, when Mr. Ruggiero asked if you needed certain money by a certain time, you said, quote:  we stamped out the three-year plan, end quote.
>
> A.     Yes, that is what was stated.

(4/6/21 Trial Transcript at 139:18-22 (B. Nocenti) (reviewing Trial Exhibit P7, Ruggiero 51, FBM 6/28/17 at 11:34 a.m.)).

40.     In the MtG community, it would have been unusual for Defendant to have written a formal contract with Plaintiff for the sale of his collection of cards.  (4/6/21 Trial Transcript at 126:23-127:4 (B. Nocenti)).

41.     As reflected on the Excel list, Trial Exhibit P8, Defendant offered Plaintiff incentives if he made payments faster.  (4/5/21 Trial Transcript at 35:15-21 (M. Ruggiero)).

42.     The parties had a "*mutual understanding that if Mr. Ruggiero paid for these cards, he would receive them, under certain terms.*"  (4/6/21 Trial Transcript at 159:24-160:1 (B. Nocenti)).

**Payments made by Plaintiff to Defendant**

43.     Defendant asked Plaintiff to make payments through an accepted payment method which included "PayPal Gift."  Plaintiff always paid Defendant through this accepted method prior to Defendant's termination of the agreement.  (4/6/21 Trial Transcript at 104:24-105:10 (B. Nocenti)).

44.     Plaintiff made his first $5,000 payment to Defendant on June 26, 2017.  (Stipulation No. 7.)

5523385v1

45.     At the time Plaintiff made his first payment, Defendant offered to push back the first payment by a month, but Plaintiff decided to make the first payment immediately to establish trust. (4/5/21 Trial Transcript at 35:7-14 (M. Ruggiero)).

46.     Defendant accepted this first payment from Plaintiff (4/6/21 Trial Transcript at 135:10-24 (B. Nocenti)).

47.     Plaintiff made eight payments of $5,000 each to Defendant towards the purchase price of the Defendant's MtG collection between June 26, 2017 and May 18, 2018. (Stipulations 7-14).

48.     As of May 18, 2018, Plaintiff had paid $40,000 to Defendant via PayPal Gift for the collection of cards in P8. (Stipulation No. 15; Trial Exhibit P29 (in response to a question from Adam Cai, defendant acknowledges that Plaintiff had paid $40,000.)

**Early May 2018: as the First Year of the Contract Comes to an End, Defendant Observes the Price Increases on the Collection**

49.     In early May 2018, Plaintiff confirmed in writing his understanding to Defendant that he had three years to pay: "*Very cool.  Ok, so we should be all set to complete the **first of three legs** in this crazy deal.  I'm excited…*" (Trial Exhibit P7, Ruggiero 00014, FBM 5/5/18 at 9:44 p.m. (emphasis added)); *see also* 4/5/21 Trial Transcript at 35:7-14 (M. Ruggiero)).

50.     When Plaintiff confirmed on May 5, 2018 that he was "all set to complete the first of the three legs" of the agreement, Defendant revealed in his reply that his focus was on the value of the cards, which had begun to rise sharply.  Defendant stated:  "***Due to the price increases lately on Beta cards I need to stick to our June Timeline***."  (Ruggiero 00016, FBM 5/5/18 at 9:24 p.m. (emphasis added)).  By late May 2018, Defendant calculated that the Beta cards he had agreed to sell to Plaintiff were already worth at least $50,000 more than the agreed selling price of $177,415. (Trial Exhibit P29).

**Late May 2018: Defendant Discussed with a Third-Party his Plans to Back out of the Deal**

51.     Trial Exhibit P29 is a separate Facebook Messenger chain of chat communications on May 29, 2018, between Defendant and Adam Cai, another buyer and seller of MtG Beta cards.

52.     The Facebook Messenger chat starts at 9:36AM on May 29, 2018 with Defendant seeking Cai's advice on how to break the deal he had with Plaintiff.  Defendant wrote:  "*you around?*"  Cai replied, "*what's up*."  Defendant asked, "*question for you*."  Cai:  "*ok*."  Defendant: "*If you had an agreement made on today last year for a total of 70k to be paid in a year, and the person didn't pay would you pull out of the deal and refund them?*". . . Cai then asks "*Mike[?]*" and Defendant replies "*yes*." (Trial Exhibit P29, at page 1.)

53.     In the Facebook Messenger chat, Defendant acknowledged that he had an "agreement" or "deal" that was made "on today a year ago [May 29, 2017]" and that $70,000 was required "to be paid in a year."  (Trial Exhibit P29 at page 1).  Defendant then posed the question: "*If . . .  the person didn't pay would you pull out of the deal and refund them?*" (*Id.*)

54.     Defendant acknowledged in this chat with Cai that the contract with Plaintiff started on May 29, 2017, the same day Plaintiff sent him an email (Trial Exhibit P1) confirming all the terms of the agreement. (Trial Exhibit P29 at page 1 (stating that the deal was made "on today a year ago")).

55.     Cai answered with a question: "*but were there terms about what would happen if he didn't pay up*" to which Defendant replied, *"those terms were not set in place*." (Trial Exhibit P29 at page 2).

56.     Cai asked: "*what are the cards*" and Defendant replied: "*all my quad betas that have gone up significantly in the past 3 months.*" (Trial Exhibit P29 at page 1).

57.     In the Facebook Messenger chat, Defendant attached and sent to Cai an Excel file labeled "Copy of All-Brians-Betas-Im interested in." (Trial Exhibit P29 at page 3).

58.     Defendant noted that the value of the cards he agreed to sell to Plaintiff have "*gone up*." Specifically, Defendant stated that the cards had "*increased in value over 50k*." Defendant also confirmed with Cai that the "*total deal was for 170k*" and that the cards are "*easily*" worth "*220 now*" [May 29, 2018.] (Trial Exhibit P29 at page 3).

59.     In the Facebook Messenger chat, Defendant revealed to Cai his plan to renege on the agreement with Plaintiff:  "*once this pwcc [auction house] check comes back, I am going to send Mike back his money.*" Cai then asked, "*so you already told him?*" to which Defendant replies: "*I'm going to give him a little more time but will contact him soon.*" Cai then asked, "*more time for him to pay*"? Defendant replied: "*Today is still within the year*." Trial Exhibit P29. Defendant revealed to Cai his motivation to "pull out of the deal." He wrote "[I] *already regret selling my alpha's not going to make the same mistake twice*." (Trial Exhibit P29 page 6-7).

60.     Cai warned Defendant that if he told Plaintiff on May 29, 2018 that the full $70k was due that day, Defendant will say "*he'll pay immediately*." (Trial Exhibit P29 at page 7).

61.     Defendant also noted the advantage of pulling out of the deal would be that he would get to "keep all the power" and "due to the insane price increases" he would consider reselling the collection at PWCC, an auction house.  (Trial Exhibit P29 at page 4).

62.     Trial Exhibit P29 establishes:  a) there was an agreement between Plaintiff and Defendant for the sale of Defendant's collection of Beta cards; b) the agreement required the Plaintiff to pay $70,000 in the first year; c) Defendant knew that the cards had increased in value sharply ("*insane price increases*") over the first year of their agreement; d) Defendant's plan was to claim that Plaintiff had breached the agreement by not paying $70,000 within the first year of the contract; and e) Defendant was already thinking about ways to resell the collection. (Trial Exhibit P29.)

## **Defendant "Cancels the Agreement" Claiming "Breach of the Agreement" by Plaintiff**

63.     Later in the day on May 29, 2019, Defendant went forward with the plan he had revealed to Cai.  Defendant sent Plaintiff a notice of termination of the agreement by email on May 29, 2019.  (Trial Exhibit P6, Termination Notice).

-8-

64.     Trial Exhibit P6, Defendant's May 29, 2018 termination email sent at 1:12 p.m. states: "I'm contacting you because the one-year deadline for the initial 70,0000 is past due, and due to this, I will be refunding you the payments you made up to this point and will be canceling our agreement because of the breach of the agreement."

65.     The only reason cited in Defendant's May 29, 2019 termination email (Trial Exhibit P6) was that the one-year deadline for the initial $70,000 payment was past due.  (4/6/21 Trial Transcript at 153:14-17 (B. Nocenti)).

Q.     So the grounds you gave for the termination was only the -- what you perceived as the past due deadline for $70,000, right?

A.     That's correct

(4/6/21 Trial Transcript at 154:12-15 (B. Nocenti reviewing Trial Exhibit P6)).

**May 29, 2018:  Plaintiff Pays Early the Balance for a Total of $70,000**

66.     Trial Exhibit P5 contains Plaintiff's response to Defendant's termination email. Plaintiff's May 29, 2018 8:59 p.m. response states, in pertinent part, that: the parties had an agreement that $70,000 was not due until the end of June; despite the fact that this deadline had not yet occurred, Plaintiff would pay Defendant another $30,000 that day to pay a total of $70,000; Plaintiff knew he had three years to pay the full contract price; Plaintiff had sold his own MtG cards to finance this transaction.  (Trial Exhibit P5.)

67.     Even though Plaintiff had expected, per their agreement, not to pay $70,000 until the end of June 2018, Plaintiff sent Defendant $70,000 in total payments the same day he received the termination email.  (Stipulation No. 17); (4/5/21 Trial Transcript at 47:12-48:6 (M. Ruggiero)).

68.     After receiving Plaintiff's $70,000 balance payment on May 29, 2018,  Defendant still refused to continue under the terms of the contract (4/5/21 Trial Transcript at 48:4-6 (M. Ruggiero)).

69.     Defendant could have used the $70,000 he received from Plaintiff to pay his home builder.  (4/6/21 Trial Transcript at 167:19-23 (B. Nocenti)).

**The Parties Discuss Defendant's Abrupt Termination of the Agreement**

70.     Trial Exhibit P5 also contains Defendant's May 29, 2018 10:07 p.m. response to Plaintiff's email.  Defendant's email claimed that:  the agreement the parties established took place in mid-May; the first year payment deadline did not start as of the first payment date; Plaintiff bought one other card from another source which Defendant assumes is the reason he was not paid faster; Defendant agreed to an "end of June" payment deadline but does not think this is appropriate since the agreement was made in May.

71.     In Defendant's 10:07 p.m email on May 29, 2018, he gives a second excuse why he terminated the contract, that Plaintiff bought one other card from another source.  (Trial Exhibit P5.)

72.     Trial Exhibit P4 contains Plaintiff's May 31, 2018 11:07 a.m. email response. Plaintiff's May 31, 2018 email response states, in pertinent part, that:  the parties had a binding contract that Plaintiff would buy 143 BGS graded Beta edition Magic: the Gathering cards; Plaintiff was required to pay $70,000 by June 29, 2018, with the remainder to be paid no later than June 29, 2020; that all of the elements of an enforceable contract are met; that Defendant acknowledged that he was aware Plaintiff was selling off his own cards to finance the transaction which caused Plaintiff to lose his own investments; that Defendant confirmed the June 2018 one year deadline multiple times in writing; that if Defendant does not decide to go forward, Defendant could be liable for "the future profits I could have made from the sale."

73.     Trial Exhibit P4 also contains Defendant's May 31, 2018 12:10 p.m. response to this message.  Defendant's May 31, 2018 email states, in pertinent part, that the parties' "official" contract started in May 2017 and he would not go forward with the contract.

74.     Plaintiff was shocked and devastated by Defendant's decision to prematurely cancel the contract. (4/5/21 Trial Transcript at 55:19-56:2 (M. Ruggiero)).

## Defendant Tries to Come up with Another Excuse:  The Sapphire Purchase

75.     Defendant came up with a second excuse to cancel the contract after sending the initial termination notice, that Plaintiff had purchased one other MtG card in the previous 11 months.  (Trial Exhibit P5.)

76.     Defendant never told Plaintiff he could not buy other MtG cards from other sources, and there is nothing in writing prohibiting Plaintiff from buying other MtG cards from other sources.  (4/5/21 Trial Transcript at 39:11-21 (M. Ruggiero)).

77.     When Plaintiff became interested in buying a single card from another seller (the "Sapphire"), he sought and received Defendant's advice on this purchase.  Defendant did not object to the purchase; in fact, he advised Plaintiff the seller was asking a good price.  (4/5/21 Trial Transcript at 40:17-25 (M. Ruggiero) and 4/6/21 Trial Transcript 145:4-8 (B. Nocenti)).

78.     Plaintiff funded the purchase price of the Sapphire with money from other sources separate from the 30 cards he sold to finance the transaction with Defendant.  (4/5/21 Trial Transcript at 80:3-11 (M. Ruggiero)).

## Keeping the Defendant Informed Was a Priority for Plaintiff

79.     Plaintiff made Defendant a main priority in his life throughout the first year of the parties' contract.

A.     *... as you said, I made him a main priority.  I did not make him my only priority in my life.  I have many priorities, like all of us do.  I wrote:  making you a priority.  I wrote specifically, I wanted -- what I will be able to juggle as making sure you and I are square is my main priority.  And I believe that clearly demonstrated this throughout the facebook chat by constantly keeping in communication with him.  That is how I made him a main priority.  I asked him multiple times throughout our interactions on the*

-10-

> *Facebook chat and e-mails and in the meeting, what does he want and what*
> *-- what does he want and when does he need it?  That was me making him*
> *a main priority in my life.*

(4/5/21 Trial Transcript at 85:12-25 (M. Ruggiero)).

80.     Plaintiff never agreed to give Defendant 100% of the proceeds from the cards he sold to finance the transaction.

> Q.     *Did Mr. Ruggiero ever promise to you that 100 percent of the sales from his*
>        *own cards would go to you within a specific period of time after receiving*
>        *those proceeds?*
>
> A.     *100 percent, no.*
>
> Q.     *In fact, you testified today that you and Mr. Ruggiero did not agree to any*
>        *specific payment schedule in year one, right?*
>
> A.     *No, we didn't.*

(4/6/21 Trial Transcript at 129:22-130:5 (B. Nocenti)).

**Plaintiff Was Encouraged and Aided by Defendant to Sell his Own MtG Cards to Finance the Transaction with Defendant**

81.     Plaintiff sold his own cards because he believed he would receive a better collection from Defendant.

> Q.     *Why did you sell these 30 cards on this list?*
>
> A.     *Well, once I was convinced that it was Mr. Nocenti's collection was*
>        *incredibly rare and it was a smart financial investment and that I really was*
>        *growing a passion for these high-graded beta cards, I decided that although many*
>        *of these cards were near and dear to me, I have had for some of them over two*
>        *decades, I was willing to make that tradeoff and go through the process of selling*
>        *them.*
>
> (4/5/21 Trial Transcript at 51:12-19 (M. Ruggiero)).

82.     Defendant intended that Plaintiff rely on his representations that he would sell Plaintiff the collection because he was obtaining Plaintiff's funds from the sale of his cards. (4/6/21 Trial Transcript at 80:23-81:3 (B. Nocenti)).

83.     Plaintiff would not have sold his own cards, and therefore lost the investment value of same, if he knew Defendant did not intend to honor their contract to purchase the collection at issue.  (4/5/21 Trial Transcript at 53:3-7 (M. Ruggiero)).

84.     Plaintiff was justified in relying on Defendant's representations because Defendant repeatedly assured him that he was making payments toward buying this collection. (Trial Exhibit P7, Ruggiero 00013, FBM 5/18/18 7:53 a.m. (emphasis added)).

85.     Plaintiff's injury in selling his own cards was proximately caused by his reliance on Defendant's representations.  (4/5/21 Trial Transcript at 53:3-7 (M. Ruggiero)).

**Both Parties and their Expert Witnesses Viewed Graded MtG Beta Cards as an Investment**

86.     On February 14, 2017, before the parties even entered into the contract, Plaintiff described the sale of Defendant's cards as Defendant getting a return on his "investments."  (Trial Exhibit P7, FBM 2/14/17 at 10:53 p.m., Ruggiero 00083).

87.     Both parties considered the professionally-grade Beta cards as investments and discussed their potential to increase in value.  Plaintiff asked Defendant on July 1, 2017 his opinion on when the investment value of high end MtG cards would increase in terms of the "window of opportunity" to buy such cards.  Defendant stated his opinion that it would be two to three years before the values increased.  (4/6/21 Trial Transcript 133:5-21 (B. Nocenti) (reviewing Trial Exhibit P7, FBM at 7/1/17 at 8:06 p.m., Ruggiero 000042)).

88.     On May 5, 2018, Defendant advised Plaintiff that the value of the collection he was buying from Defendant was increasing.  (Trial Exhibit P7, FBM at 5/5/2018 at 9:24-9:26 p.m., Ruggiero 000016).

89.     Plaintiff specifically told Defendant on May 31, 2018, before Defendant allegedly sold the collection to other buyers, that if he continued with his decision to break their contract, Defendant could be responsible for "***the future profits I could have made from the sale***."  (Trial Exhibit P4, Ruggiero 000007 (emphasis added)).

90.     Defendant reasonably knew Plaintiff was buying his collection as an investment as he testified that the intent of buying and selling MtG cards is to make a profit.  (4/6/21 Trial Transcript at 125:21-24 (B. Nocenti)).

91.     At the time Defendant and Plaintiff entered into the contract at issue, Defendant anticipated that the investment value of the collection would increase over time.

> Q.     *So towards the bottom it's July 1st, 2017.  On July 1st 2017 at 8:05 p.m., Mr. Ruggiero says to you:  and do you think there is a certain window of opportunity before all this high end stuff goes up?  You reply:  I think we have a two to three -- two, maybe three-year window.  Do you know what you were referring to?*

> A.     *He asked me my opinion on when cards might go up, so I gave him my opinion.*

> Q.     *So you're anticipating that the cards would increase in two, maybe three years?*

A.      **It was my assumption.**  *There is no data I was going off of.*

Q.      *But your assumption was correct, right?*

A,      *Depending on how you want to look at it.  You could say yes, after three years.  There was some increase in value, of course.*

(4/6/21 Trial Transcript 133:5-21 (B. Nocenti) (emphasis added)).

92.      At the time Defendant and Plaintiff entered into the contract at issue, Plaintiff also anticipated that the investment value of the collection would increase over time.  (4/5/21 Trial Transcript at 53:11-55:1 (M. Ruggiero)).

93.      Defendant's expert on the value of the cards, Mr. Bruso, agreed that it was reasonable for a buyer to assume in 2017 that the value of the collection of cards on P8 would increase over time:

Q.      *And it would be reasonable to assume in 2017 that if you were buying graded Magic:  the Gathering Beta cards, they would continue to increase in value over time?*

A.      *You could assume that, but no market is stable.*

Q.      *Do you think that would be a reasonable assumption based on the history?*

A.      *Yes.*

(4/21/21 Trial Transcript at 70:24-71:6 (J. Bruso)).

- According to Mr. Bruso, a mint condition Beta Black Lotus was worth approximately $8 in 1993, $500-$2,000 by the year 2000, and $9-$15,000 by 2017.  An average mint condition Rare card was worth approximately $1-2 in 1993, $5 by 2000, and $75 by 2017. Even as to a non-Rare card, an average mint condition non-Rare card was worth approximately $0.25-$0.50 in 1993, $1 by the year 2000, and $30, by 2017.  (4/21/21 J. Bruso)).  Thus, mint condition and professionally graded Beta edition Magic:  the Gathering cards had increased in value by up to **187,400%**[1] between 1993 and 2017, when the parties entered the contract, further indicating the parties' assumptions that value of the collection would increase was reasonable.

- Between 2018 and 2019, as well as between 2019 and 2020, Mr. Bruso observed a 25-100% increase in value for graded Beta cards

---

[1] $15,000 (Mr. Bruso's valuation on Lotus in 2017) – $8 (Mr. Bruso's valuation of Lotus in 1993) / $8 (Lotus in 1993) = 1874 x 100 = 187,400% increase between 1993 and 2017.

year over year, which was consistent with how the market performed previous to 2017.  (4/21/21 Trial Transcript at 71:21-72:3 (J. Bruso)).

- It was foreseeable to people who play and collect Magic:  the Gathering cards that this collection would increase over time from 2017.  (4/5/21 Trial Transcript at 146:16-21 (N. Coss)).

- The upward trajectory of the cards is based on new players and collectors and a stagnant supply as the cards were limited edition and printed in 1993.  (4/6/21 Trial Transcript at 22:19-23:1 (T. Landry)).

- In May 2018, Defendant even commented in writing to Plaintiff that the value of the collection had increased upwards of 30% just since May 2017 (Trial Exhibit P7, FBM 5/5/18 at 9:24 p.m. Ruggiero 00016; 4/6/21 Trial Transcript at 97:3-8 (B. Nocenti)).

- In May 2018, Defendant also commented to Adam Cai, another well-known MtG card seller, that the value of the collection had increased since May 2017.  (Trial Exhibit P29, p. 1 "and the cards in the deal have gone up"; "all my quad betas that have gone up significantly in the past 3 months"; p. 2:  "if it was like 10k worth of stuff I'd be like whatever, but we're talking an increase on these of over 50k"; p. 3:  when asked "and you think they're [$]220 now?," responded:  "easily".)

94.     Defendant's collection was a very valuable, tangible asset. (4/5/21 Trial Transcript at 196:5-12 (T. Landry)) ("*additionally, Magic:  the Gathering has become a very hot tangible asset that people purchase for investment reasons on a speculative nature because the market just keeps going up and up and up.  So in fact, yes, it is a nerdy collectible, as you would put it, but in the reality in 2021, it is a true financial asset that people invest in, no different than the NASDAQ or a mutual fund.*")

95.     The fair market value of Professionally graded Beta edition MtG cards can be estimated with reasonable certainty.  Both parties submitted expert reports with opinions on the value of the Magic Cards.  (*See* ECF Nos. 28-3, 28-4, 28-7, 28-8, Trial Exhibits P57A and P58A.)

96.     Defendant's expert asserted that the margin of error on his estimates was very narrow, between 2.5-5%.  (4/6/21 Trial Transcript at 76:9-14 (J. Bruso)).  Plaintiff's experts independently came to fair market values that were within 7-18% of each other for the total value of all the cards at issue in 2018 and 2021.

97.     The fair market value of collectable MtG cards can be estimated with reasonable certainty.

A.   *It is no longer -- Magic: the Gathering is no longer the days of kids hanging out in their parents' basements pretending to be wizards.  Magic: the Gathering today has become a serious financial marketplace, and it has a ticker just like the S&P 500 or the DOW Jones.  I mean, it is an actual commodity no different than gold and silver.*

Q.   *I watch CNBC every day and I've never seen a ticker for magic cards.  So where is there a magic card ticker?*

A.   *Just go to any website, troll and toad, mtg tracker.  I mean, there are so many websites that keep track.  I mean, I literally -- for my cards – I personally don't buy magic cards for my own investment.  I buy Pokémon and Yu-Gi-Oh, because that was my childhood.  I literally have a program called GPA that is like me logging into my E\*Trade or Vanguard account where I keep track of my cards, I keep track of the market.  I keep track of what I paid, what they are selling for.  Yeah, these prices are tracked like that.*

(4/6/21 Trial Transcript at 51:2-22 (T. Landry)).

## It Would Have Taken Plaintiff a Period of Time to Re-sell Defendant's Collection if he Obtained it in June 2020

98.   If Defendant had not breached the contract, Plaintiff would have been entitled to take possession of the entire collection by June 2020.  (4/5/21 Trial Transcript at 39:3-7 (M. Ruggiero)).

99.   Both of Plaintiff's experts, Mr. Coss and Mr. Landry, came to an approximate value of the collection in June 2020.  (4/5/21 Trial Transcript at 148:13-23 (N. Coss); 4/6/21 Trial Transcript at 23:4-10 (T. Landry)).

100.   It would have taken between six months to one year for Plaintiff to re-sell the collection if he had obtained possession of it in June of 2020.  (4/5/21 Trial Transcript at 43:8-24 (M. Ruggiero); at 149:9-13 (N. Coss); 4/6/21 Trial Transcript at 24:14-25:2 (T. Landry)); 64:4-14 (J. Bruso) (Mr. Bruso noting it would take some time to sell this collection because rarer cards are harder to sell)).

101.   Therefore, Mr. Coss and Mr. Landy's January/February 2021 valuations reflect the fair market value of the collection at the time Plaintiff could have expected to find a buyer of the collection and sell it at fair market value.[2]

---

[2] Even if the Court were to find that Mr. Ruggiero's damages are limited to the time of breach, May 2018, both Mr. Landry and Mr. Coss confirmed that the collection had substantially increased in value by that time.  Mr. Landry valued the collection at approximately $250,000 in May 2018, and Mr. Coss valued the collection approximately $305,000 in May 2018.  Subtracting the contract price of $177,415, Mr. Ruggiero's damages would be between $72,585-127,585.  Plaintiff submits that the appropriate calculation of damages, however, is his expectation damages.

-15-

**In May 2018, the Collection of MtG Cards Defendant Agreed to Sell was not Replaceable as a Collection or by Piecemeal**

102.  Plaintiff could not have reasonably prevented the loss by cover because the collection of 143 cards was not replaceable on the market.  Plaintiff was buying a single collection of 143 cards, and the Excel List was not a list of individual cards he merely had the option to buy.  (4/5/21 Trial Transcript at 33:5-16 (M. Ruggiero)).

103.  In May 2018 when Defendant gave notice he was terminating the agreement, it would have been nearly impossible for Plaintiff to have found the same collection of cards with the same grading on the market for sale.  (4/5/21 Trial Transcript at 49:19-50:5 (M. Ruggiero) ("There was a significant portion of the cards that were of such high grade and low population, which just means there have not been any other cards graded at that particular grade, that it was just such a unique collection and of high grade to find somebody else who had this collection would be near impossible.")).

104.  Plaintiff's expert, Mr. Coss, agreed that the collection was not replaceable nor was there a comparable collection available for sale.  (4/5/21 Trial Transcript at 148:24-149:5 (N. Coss) ("No.  These cards are all graded and serial numbered.  So this collection does not exist anywhere on the market, but even so, there are not collections comparable to this that are on the market.")).

105.  Plaintiff's expert, Mr. Landry, agreed that it would be "very, very difficult, if not impossible" to replace the collection.  (4/6/21 Trial Transcript at 24:7-13 ("It would have been extremely difficult because -- let alone the fact that they are limited Beta print cards, they are of the highest grade and quality that you could find especially.  And to find this type of culmination of cards in one setting of all these – of this BGS-graded level would be very, very difficult, if not impossible to replace in one lump sum."  Mr. Landry continued:  "So out of 136[3] cards in question on this list, yeah, you might have been able to buy 10, you might have been able to buy 30 of them. I can't give you an exact figure, but I would bet two to one that on -- prior to the day before May 2018 if you wanted to go out and buy all 136 cards on one given day, it would be an impossible task."  (Id. at 39:7-13).

106.  Mr. Bruso confirmed that it would be "very, very, very hard" to replace this collection piecemeal, and "nearly impossible" to replace it as a collection, as it was purchased. (4/21/21 Trial Transcript at 53:13-54:11 (J. Bruso)).

107.  Additionally, Mr. Bruso confirmed that for some cards within the collection there were not any Beta cards with the same grade and subgrade that came on the market since 2018 within the collection.  (4/21/21 Trial Transcript at 54:7-11 (J. Bruso)).  Therefore, the collection would have been literally impossible to replicate.

108.  Plaintiff did buy other Beta edition MtG Cards following Defendant's breach.  (4/5/21 Trial Transcript at 59:20-60:1 (M. Ruggiero)).  Indeed, Plaintiff purchased approximately 30 cards, including an inferior Beta Black Lotus, graded 9.5 Quad +.  (Id. at 59:20-62:13).

---

[3] Mr. Landry's focus on 136 cards reflects that he did not value the 7 nominal cards in the collection.

109.     While these efforts demonstrate Plaintiff's continued commitment to using the purchase of Beta edition MtG cards for investment purposes since Defendant's breach in May 2018, for the reasons explained *supra*, Plaintiff could not have accomplished cover of this collection.

110.     Defendant failed to plead mitigation of damages as an affirmative defense in his Answer.  [Doc. No. 8].

111.     Even if Defendant had not failed to plead mitigation of damages as an affirmative defense, Defendant, as the breaching party, also failed to meet his burden to show that Plaintiff's losses could have been avoided by reasonable effort.  Indeed, Defendant presented no evidence at trial substantiating his argument that the collection could have been re-purchased on the market.

**Plaintiff Suffered an Additional Loss by Selling his Own MtG Cards to Finance the Transaction Defendant Reneged On**

112.     Plaintiff sold 30 of his own MtG cards with the "primary purpose" of financing the transaction with Defendant, and paid Defendant $40,000 of the $60,000 he obtained from those sales.  (4/5/21 Trial Transcript at 50:6-51:19 (M. Ruggiero)).

113.     Defendant helped Plaintiff sell his own cards to finance the transaction with him by giving Plaintiff his opinion on what to ask for the purchase prices of his cards.  (4/6/21 Trial Transcript at 80:13-81:13).

114.     Plaintiff would not have sold his 30 cards if he knew Defendant was going to breach their contract and pull out of the deal.  (4/5/21 Trial Transcript at 53:3-7 (M. Ruggiero)).

115.     Plaintiff was unable to buy back the 30 cards he sold to finance the transaction with Defendant because at the time he learned of the breach, he would have had to pay more to buy back his cards due to these cards' increase in value and thus suffered an investment loss compared to if he had never sold them.  (4/5/21 Trial Transcript at 105:5-14 (M. Ruggiero)).

**July 2018:   Defendant Supposedly Sold his Collection of Rare Graded MtG Cards to Unknown Buyers in a Parking Lot for Cash, with No Receipts or Records of the Sale**

116.     Defendant's testimony that he re-sold the collection to buyers in a Whole Foods parking lot for $135,000 cash in July 2018 and has no record of this sale, is not credible. (4/6/21 Trial Transcript at 11:7-13 (B. Nocenti)).

117.     Defendant's story runs counter to what he told Mr. Cai and Defendant's claim that he re-sold the collection for $30,000 less than Plaintiff was willing to pay is not credible.  (4/6/21 Trial Transcript at 167:15-18 (B. Nocenti)).  Defendant claims he sold the collection in July 2018 for $92,415[4] less than he told Mr. Cai the collection was worth in May 2018.  (Trial Exhibit P29 at page 2 (Defendant tells Mr. Cai the collection is easily worth $50,000 more than the contract

---

[4] ($177,415 (contract price) + $50,000 (Mr. Nocenti's opinion on increase in May 2018)= $227,415.   $227,415 - $135,000 (claimed sales price to Ben and Shawn) = $92,415.

price of $177,415.  Defendant vowed not to make the same mistake with his Beta cards that he had made with his Alpha cards – selling them too soon before the market went up.)).

**The Credibility of Defendant's Testimony**

118.    Defendant's testimony was generally argumentative and was not as credible as Plaintiff's testimony.  By way of three examples:

Q.    *And you understood that when you entered into the transaction with Mr. Ruggiero, he was much less experienced in buying magic: the gathering cards than You, right?*

A.    *I had no idea what his experience was at that point in time.*

Q.    *Okay. I will refer you to your deposition, May 16, 2019 starting at page 132, line 23.  Question: when you were dealing with Mr. Ruggiero prior to May 7th, what was your understanding regarding his experience in terms of Purchasing graded -- Beckett graded service graded cards.  Answer: he was new to this.*

A.    *Yeah.  To graded cards, yes.  What page was that?*

Q.    *133.*

(4/6/21 Trial Transcript at 125:25-126:18 (B. Nocenti)).

\* \* \*

Q.    *You told Mr. Ruggiero multiple times over Facebook Messenger that the deadline to pay the $70,000 was by the end of June 2018, correct?*

A.    *That was predicated upon him selling his cards and making me his first priority, which he did not do.*

Q.    *I will ask it again. You told Mr. Ruggiero multiple times over Facebook Messenger that he was required to pay you $70,000 by the end of June 2018. Correct?*

A.    *I just answered your question.*

Q.    *All right. Let's look at the Facebook chat.  [Technical issue.]  Let's turn to page 7 of 83, which is Ruggiero 17.  Tell me when you are there, Mr. Nocenti.*

A.    *I'm there.*

Q.    *On May 18, 2018 at 10:26 a.m., Mr. Ruggiero said: you want $70,000 by the end of June, and that Will work best for you? And then on the next page,*

> *which is Page 6 of 83 at Ruggiero 16, you say: that would be perfect. Is that right?*

A.   *Yes. That is correct.[...]*

(4/6/21 Trial Transcript at 136:17-137:15 (B. Nocenti)).

* * *

Q.   *And you testified that learning this information, I think you phrased it, caused you to lose faith in him that he would pay the $70,000 by the end of June?*

A.   *That was the ultimate end of this entire Agreement. At this point when I sent this initial e-mail on 1/12 I was willing to work with Mr. Ruggiero, just trying to figure out what we could come to and resolve. Once I found out two, two-and-a-half hours later that Mr. Ruggiero went behind my back and bought this other card, I lost complete faith in him.*

Q:   *And your faith was not restored by the fact that he sent you $70,000 that exact same day?*

A.   Absolutely not, because it was not in the right form of payment, and he had lied to me in the past, that this was going to be his main priority, and it clearly wasn't.

Q.   *So the fact that it was what you say was the wrong form of payment, led you to believe that he, in colloquial terms, was not good for the money?*

A.   *That is not what I'm saying at all. I'm saying, and I made it clear earlier today, that if he wanted to and we agreed to move forward, he could have picked up $70,000 worth of cards, went back home, called up Paypal and gotten his transaction reversed, especially with a credit card payment. It's very easy to do with a credit card payment.*

Q.   *My question is, why didn't the fact that he gave you $70,000 that day restore your faith in him that he would pay you $70,000?*

A.   *Because it was not in the right form of payment. It was not one of the four agreed-upon payments.*

Q.   *And you thought because it was not in one of the four agreed payments, he did not have the money?*

A.   *That is not what I'm saying at all. Like I stated earlier, at 3, roughly 3:30-ish, Adam Cai confirmed that your client purchased a card from him for $37,500, which I later found out. And at that point, that is when I was not willing to move forward with any sort of deal with your client, and those payments came in later that day, sometime after 9 o'clock.*

-19-

Q.      *And just to be clear, as of May 29th, 2018, Mr. Ruggiero attempted to send you $70,000, correct?*

A.      *In the incorrect form of payment, yes.*

(4/6/21 Trial Transcript at 155:15-157:8 (B. Nocenti)).

119.    Defendant's expert, an industry staple, never heard of Ben and Shawn (last names unknown) in Glen Mills, PA, the alleged buyers of the collection. (4/21/21 Trial Transcript at 47:25-48:3 (J. Bruso)).

120.    Defendant received a June 6, 2018 spoliation/litigation hold letter from Plaintiff's counsel, which is Trial Exhibit P31. (4/6/21 Trial Transcript at 163:23-164:9 (B. Nocenti)).

121.    Despite his receipt of this June 6, 2018 letter, Defendant claims he re-sold the collection, minus one card, on July 23, 2018 to Ben and Shawn, whose last names Defendant cannot recall. (*Id.*; 4/6/21 Trial Transcript at 107:12-13 (B. Nocenti)).

122.    Defendant testified that he landed on the price for the collection after just 10-15 minutes of negotiation with Ben and Shawn. (4/6/21 Trial Transcript at 116:10-13 (B. Nocenti)).

**Plaintiff's Expert, Mr. Coss, Provided Valuations of the MtG Cards with Reasonable Certainty**

123.    Of the 143 cards Plaintiff was to buy from Defendant, seven were of nominal value (143 cards – 7 nominal cards = **136** cards valued by the three experts). (4/5/21 Trial Transcript at 122:2-10 (N. Coss on nominal cards)). None of the experts valued these seven nominal value cards.[5]

124.    The Court found Mr. Coss's estimates of the fair market value of the MtG cards Defendant agree to sell to Plaintiff were credible.

125.    Mr. Coss is the owner of a trading card store specializing in MtG and has extensive experience establishing the value of MtG cards for resale. Mr. Coss began professionally pricing MtG cards in the mid-2000s then opened his own store in 2011 where he professionally priced MtG cards. (4/5/21 Trial Transcript at 113:11-115:10 (N. Coss)).

126.    Mr. Coss has taught seminars for years at trade shows to other retailers on how to price and sell MtG cards. (4/5/21 Trial Transcript at 115:18-116:3 (N. Coss)).

127.    Wizards of the Coast, the creator of MtG, has contracted with Mr. Coss to host premiere level MtG events across the country. (4/5/21 Trial Transcript at 116:14-25 (N. Coss)).

---

[5] Mr. Bruso also placed valuations on two cards that were not part of the parties' agreement, the Mox Ruby and Mox Pearl. These two valuations are included in Mr. Bruso's totals and should be disregarded.

128.     Mr. Coss estimated that he has set prices for "millions" of MtG cards.  (4/5/21 Trial Transcript at 114:21-115:2 (N. Coss)).

129.     Mr. Coss applied a sound methodology to reach his valuations.  (4/5/21 Trial Transcript at 128:19-130:12 (N. Coss)).

130.     Mr. Coss's methodology includes consideration of the professional grade of the card, review of the population of that grade of card in the world, and comparison of actual sales of comparable cards.  (*Id.*)

131.     Mr. Coss valued the collection of MtG cards Defendant agreed to sell to Plaintiff at approximately $305,000 in May 2018, $479,000 in July 2019 and $668,000 in February 2021.  (4/5/21 Trial Transcript at 121:1-22, 147:3-6 (N. Coss)).

132.     According to Mr. Coss, the value of the six most valuable cards in the collection (Ancestral Recall, Black Lotus, Mox Sapphire, Time Walk, Time Twister and Volcanic Island (collectively referred to herein as the "Best Six")) increased by approximately 133% from May 2018 to February 2021.  (4/5/21 Trial Transcript at 146:9-12 (N. Coss)).

133.     According to Mr. Coss, the approximate value of 136 cards in the middle of 2020 was approximately 10% less than his 2021 valuation based on his observation of the market over that time.  (4/5/21 Trial Transcript at 148:13-23 (N. Coss)).  Ten percent less than Mr. Coss's February 2021 valuation of $668,000 is a June 2020 value of $601,200.

134.     Mr. Coss came to his valuations within a reasonable degree of professional certainty.  (4/5/21 Trial Transcript at 150:14-17 (N. Coss)).

135.     Subtracting $668,000, Mr. Coss's February 2021 valuation, from the contract price of $177,415 sets the expectation damages for the breach of contract at $490,585.

**Plaintiff's Expert, Mr. Landry, Provided Valuations of the MtG Cards
with Reasonable Certainty**

136.     The Court found Mr. Landry's estimates of the fair market value of the MtG cards Defendant agree to sell to Plaintiff were credible.

137.     Mr. Landry is a professional appraiser and applied a sound methodology to reach his valuations (4/5/21 Trial Transcript at 176:19-177:18 (T. Landry)).

138.     Mr. Landry's methodology is that he identifies an item, establishes the condition, compares public data points for actual sales, considers the population of the card in the word, and consults with other experts, where appropriate, to ensure his appraisals are reasonable. (4/5/21 Trial Transcript at 198:3-199:23 (T. Landry)).

139.     Mr. Landry has traveled the country appraising collectibles, including trading cards, since he was 13 years old.  (4/5/21 Trial Transcript at 174:4-176:12 (T. Landry)).

140.     Mr. Landry is a professional appraiser for the PBS television show *Antiques Roadshow* and has appraised Beta edition MtG cards for that program.  (4/5/21 Trial Transcript at 178:14-180:20 (T. Landry)).

141.     Mr. Landry applied the same methodology that professional appraisers utilize globally (4/5/21 Trial Transcript at 199:24-200:10 (T. Landry)).

142.     Mr. Landry's valuations for the 136 cards were approximately $250,000 in May 2018 and approximately $622,000 in January 2021.  (4/5/21 Trial Transcript at 194:7-18 (T. Landry)).

143.     According to Mr. Landry, the value of the six most valuable cards in the collection (Ancestral Recall, Black Lotus, Mox Sapphire, Time Walk, Time Twister and Volcanic Island (collectively referred to herein as the "Best Six")) increased by approximately 132% from May 2018 to January 2021.  (4/6/21 Trial Transcript at 21:20-24 (T. Landry)).

144.     According to Mr. Landry, the 136 cards in total experienced an overall appreciation of 150% from May 2018 to January 2021.  (4/6/21 Trial Transcript at 22:11-15 (T. Landry)).

145.     According to Mr. Landry, the approximate value of 136 cards in the middle of 2020 was approximately 10% less than his 2021 valuation based on his observation of the market over that time.  (4/6/21 Trial Transcript at 23:4-10 (T. Landry)).  Ten percent less than Mr. Landry's January 2021 valuation of $622,000 is a June 2020 value of $559,800.

146.     Both Mr. Landry and Defendant's expert, Mr. Bruso, agreed that the pandemic was not a substantial factor in the increase of the value of the collection.  (4/6/21 Trial Transcript at 49:16-50:4 (T. Landry), and at 207:20-208:2 (J. Bruso)).

147.     Mr. Landry came to his valuations within a reasonable degree of professional certainty.  (4/5/21 Trial Transcript at 194:7-18 (T. Landry)); 4/6/21 Trial Transcript at 26:7-10 (T. Landry)).

148.     Subtracting $622,000 (Mr. Landry's January 2021 valuation) from the contract price of $177,415 sets the expectation damages for the breach of contract at $444,585.

**Plaintiff's Experts Did Not Confer in Any Way - The Consistency of Their Independent Valuations Adds to the Credibility of Their Methodologies and Opinions**

149.     Plaintiff's experts, Mr. Landry and Mr. Coss did not confer with each other in any way in reaching their valuations, nor were they told of each other's valuations prior to coming to court on the first day of trial.  (4/5/21 Trial Transcript at 149:17-150:8 (N. Coss); 4/6/21 Trial Transcript at 25:12-26:4 (T. Landry)).

150.     Despite the fact that Plaintiff's experts did not confer, their 2018 valuations are only $55,000 apart.

151.     Despite the fact that Plaintiff's experts did not confer, their 2021 valuations are only $46,000 apart.

5523385v1

152.     Despite the fact that Plaintiff's experts did not confer, both experts opined that the Six Rare Cards experienced a 132-133% increase in value between May 2018 and January/February 2021.

153.     These blind valuations between Plaintiff's experts suggest that their methodologies are sound, objective and accurate.  It also demonstrates that the valuations were calculated with reasonable certainty.

154.     Defendant's expert, Mr. Bruso, agreed with Mr. Landry's and Mr. Coss's valuations as to **130 of the 136 cards all three experts valued**.  (4/21/21 Trial Transcript at 88:20-24 (J. Bruso)) ("Q.  *So for most of the cards, other than the six rare cards[6] we discussed earlier, Mr. Landry and Mr. Coss's estimates for fair market values are within the same range as your estimates, right?  A.  Yes*").

### Defendant's Expert, Mr. Bruso, is Well Qualified, but Some of His Valuations Were Suspect

155.     Mr. Bruso is the owner of Graded Power, a company that deals in collectible trading cards with an emphasis on MtG cards.  (4/6/21 Trial Transcript at 175:23-176:13 (J. Bruso)).

156.     Mr. Bruso's estimate of the total value of the cards in May 2018 is perplexing and suspect.  Subtracting the estimated value of the MtG cards "Mox Pearl" and "Mox Ruby," which were not part of the deal, from Mr. Bruso's May 2018 total valuation on D-12A, he estimated the total value of the collection was $121,663 in May 2018.  But that valuation is about **$105,000 less**[7] than what Defendant told Mr. Cai the collection was worth in May 2018. (Trial Exhibit P29 at page 2, Defendant tells Mr. Cai the collection is easily worth $50,000 more than the contract price.) It is even lower than the $135,000 Defendant claimed he sold the collection cards to "Ben and Shawn" in July 2018.  (4/6/21 Trial Transcript at 11:7-13 (B. Nocenti testifies he sold 142 cards in the collection for $135,000.)

157.     The six cards that Mr. Bruso's valuations differ most from Mr. Landry and Mr. Coss are the highest value cards:  Ancestral Recall, Black Lotus, Mox Sapphire, Timetwister, Time Walk and Volcanic Island (the "Best Six").  All experts agreed that the value for such cards rose rapidly between May 2018 and February 2021, but Mr. Bruso's estimates are so drastically low for 2018 that they skew the percentage increase in value of those cards to levels that must be viewed as farfetched.  See F/F 158-160 below.

158.     Mr. Landry's and Mr. Coss's valuations as to the Best Six are more reliable than Mr. Coss's.  Despite the fact that Plaintiff's experts did not confer, both experts opined that the Six Rare Cards experienced a 132-133% increase in value between May 2018 and January/February 2021.

---

[6] The six being: Ancestral Recall, Black Lotus, Mox Sapphire, Time Walk, Time Twister and Volcanic Island.

[7] ($177,415 (contract price) + $50,000 (Mr. Nocenti's opinion on increase in May 2018)= $227,415.   $227,415 - $121,663 (Mr. Bruso's May 2018 valuation)  =**$105,752**.

159.     In contrast, Mr. Bruso opined that the Six Rare Cards experienced a *338%* increase in value between May 2018 and February 2021. (4/21/21 Trial Transcript at 83:15-25 (J. Bruso)).[8]

160.     Mr. Bruso acknowledged that the reason his increases were so much higher was because his 2018 valuations of the Six Best Cards were significantly lower than Mr. Landry and Mr. Coss's valuations. (4/21/21 Trial Transcript at 85:19-86:3 (J. Bruso)).

161.     As an example of his errors on one of the Six Best Cards, Mr. Bruso failed to consider significant data points in coming to his low-ball valuations for the Timewalk. (4/6/21 Trial Transcript at 43:12-22 (T. Landry)).

162.     During Mr. Bruso's direct examination, he attempted to criticize Mr. Landry's valuation of the BGS 10 Timewalk, which Mr. Landry valued between approximately $45,000-$55,000 in May 2018. Mr. Bruso stated that he did not think that valuation was supportable because "*I did not see a card of 9.5 sell for that price. So I don't think that was a correct evaluation.*" (4/21/21 Trial Transcript at 11:12-19 (J. Bruso)).

163.     Regardless of whether Mr. Bruso believes he did not see a comparable sale on the BGS 10 Timewalk when he drafted his July 2019 Report, Mr. Landry considered the public sale of a BGS 9.5 Timewalk in coming to his valuation. Mr. Landry confirmed:  "*There are five [BGS 10] time walks in the Beckett population, and there are 65 9.5's, and my most recent data point is that a 9.5 had sold on Heritage Auctions on May 18, 2019 for $20,400. That was the last transaction for a 9.5.*" (4/6/21 Trial Transcript at 43:12-22 (T. Landry)).

164.     Mr. Bruso conceded that he did not include any data points for the 2018 Timewalk in his "Materials Considered" within Trial Exhibit D-10A, even though Mr. Landry was able to point to data points available at the time each expert was drafting their respective his reports. (*Compare* 4/21/21 Trial Transcript at 12:11-13:4 (J. Bruso) ("*I had no data on the Time Walk.*"); 4/6/21 Trial Transcript at 43:12-22 (T. Landry) (*considering an auction sale of a BGS 9.5 Timewalk available at the time both experts drafted their first expert reports*).

165.     Mr. Bruso was mistaken when he testified (twice) as to the population of BGS 10 Timewalk:  "I think there's only two in the world." (4/21/21 Trial Transcript at 13:8-12; 31:14-15 (J. Bruso)).  However, according to BGS population report, there were in fact five Timewalk BGS 10s. (4/6/21 Trial Transcript at 43:12-22 (T. Landry)).

166.     In coming to his February 2021 Timewalk valuation of $40,000, Mr. Bruso considered a sale of a BGS 9.5 in December 2020 which sold for $13,000. (4/21/21 Trial Transcript at 28:9-11 (J. Bruso)).  That again, however, was not the only data point Mr. Bruso could have considered.  For example, Mr. Landry considered a Time Walk 9.5 that sold at public auction for $20,400 in May 2019. (4/5/21 Trial Transcript at 143:5-144:4 (T. Landry). Mr. Landry considered that the BGS Timewalk only had a population of five, which made it worth significantly more than a BGS 9.5. (4/6/21 Trial Transcript at 43:12-22 (T. Landry)) ("*A 9.5 compared to a 10,*

---

[8] Indeed, Mr. Bruso opined that the Black Lotus had increased by an unbelievable 760% in just two and half years. (4/21/21 Trial Transcript at 84:7-10 (J. Bruso)).

*a 10 is 13 times rarer to that of a 9.5 based on population.  So I'm only applying a factor of 5 in coming to my evaluation.*")

167.     Mr. Bruso relied on his memory (which like everyone, is fallible) to come to his valuations, which is not an accepted or reliable methodology for experts in the field.  (4/21/21 Trial Transcript at 38:21-24 (J. Bruso)  ("*I can run down a list on ebay, see all the numbers, and be like, hey, I know what that card is, I know what that card, I actually have seen that card, that is our card.*")).

168.     Relying on memory is not an accepted methodology for experts in the field.  For example, in his testimony, Mr. Bruso stated that one of the cards in the collection, Disenchant, had a population of 119 BGS 9.5s.  (4/21/21 Trial Transcript at 61:20-21 (J. Bruso)).  Mr. Bruso was cross examined with the fact there are actually only 66, about half what he recalled, and he agreed he did not have reason to dispute that correction.  (*Id.* at 63:15-18.)

169.     Mr. Bruso's criticisms of Plaintiffs' expert's consideration of multiple data points to reach their Beta Black Lotus valuations are unpersuasive.  Mr. Bruso stated he was critical of the fact that Plaintiff's experts considered data points for Alpha edition Black Lotus cards.  (4/21/21 Trial Transcript at 23:23-24:22 (J. Bruso)).  After considering a number of Beta Black Lotus data points, Mr. Coss also explained what may be extrapolated from a similarly high-grade Alpha edition Black Lotus data points.  (*Id.* at 137:24-138:17.)

> *Now, Alpha Black Lotuses are worth more than beta black lotuses, but they follow a similar trajectory, one of them goes up, the other one goes up by a similar amount. We see that throughout the years.  So it's just another one of the sales that we see of this type of card and get a better understanding of kind of where it all sits.*
>
> …
>
> [The Alpha sale] *highlights the importance of that 10 grade and why when a card gets graded, when we talk about quad plus we talk about it getting closer to that 10.  And you can see the big difference here between [$]122,000 of the previous item we discussed and the [$]511,000 of the PSA 10.  Now Alpha Black Lotuses are worth a little more than Beta Black Lotuses, but you can see that big jump.  There's a similar jump in Beta when you talk about the condition getting better.*

170.     Mr. Bruso based a considerable amount of his valuations on non-verifiable data – *i.e.* his own non-public archive.  (4/21/21 Trial Transcript at 78:21-24 (J. Bruso)).

171.     There is no way for anyone to verify Mr. Bruso's sales data he keeps on archive.  (4/21/21 Trial Transcript at 78:4-12 (J. Bruso)).

172.     Mr. Bruso's use of non-public data is not an accepted methodology according to an expert appraiser, Mr. Landry.  Mr. Landry said he did not consider Mr. Bruso's nonpublic archive sales he listed in his report because he bases his valuations on verifiable facts, "not stories."  (4/6/21 Trial Transcript at 8:13-21 (T. Landry)).

173.     Mr. Bruso made significant errors in the consideration and extrapolation of his *own* data points.

174.     As three examples within his July 2019 report, Mr. Bruso valued "Gaea's Liege" at $54 in May 2018, when the only data point he listed that he considered was an inferiorly graded card that sold on July 31, 2018 for $270.  (4/21/21 Trial Transcript at 79:19-80:8 (J. Bruso)).  Mr. Bruso valued the Plateau at $1,750, when the only data point he listed that he considered was for a comparable card that sold the same month for $2,200.  (*Id.* at 80:9-19.)  Mr. Bruso valued the Tsunami at $65 when the only data point he listed that he considered was for an inferiorly graded card that sold a month earlier for $332.  (*Id.* at 80:20-81:6).  These valuations based on Mr. Bruso's own data points are unsupportable.

175.     Although he agreed with the generally accepted legal definition of fair market value,[9] Mr. Bruso appeared to conflate fair market value valuations with the margin of profit or loss he was willing to accept personally in his business transactions.

> Q.     *So you have never assessed -- I've said that I think that these five cards would each be $10.  It turns out in fact that people were willing to pay $20 for these cards, so my margin of error was high on that transaction.  You have never sat down and thought about that*?

> A.     *No, I base -- like I said, I based on what I've purchased the card for and then sell it for, and I'm happy with the margin that I make through there. So if I sold it too low or I sold it too high, it's part of life.*

(4/21/21 Trial Transcript at 74:17-75:2 (J. Bruso)).  Thus, Mr. Bruso's appraised values reflect his own personal pricing, not the pricing of the public market at large.

176.     There are myriad errors in Mr. Bruso's February 2021 report, as well.  Even though this case does not involve *any* Alpha edition MtG cards, he identifies the cards by this wrong edition no less than *four* times.  (4/21/21 Trial Transcript at 81:21-82:8 (J. Bruso)).

## PROPOSED CONCLUSIONS OF LAW

177.     The Court has jurisdiction over this lawsuit under 28 U.S.C. §1332(a)(1) because Plaintiff and Defendant are citizens of different states, and the matter in controversy exceeds $75,000, excluding interest and costs.  Specifically, Mr. Ruggiero is a citizen of the State of New Jersey and Mr. Nocenti is a citizen of the Commonwealth of Pennsylvania.  (Compl. ¶5 [Doc. No. 1].)

---

[9] Fair market value is defined as "The price that a seller is willing to accept and a buyer is willing to pay on the open market and in an arm's-length transaction; the point at which supply and demand intersect." Black's Law Dictionary (11th ed. 2019).

-26-

178.     Venue is proper in the Eastern District of Pennsylvania under 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to this claim occurred in this District.

179.     The Court is the trier of fact and the judge of credibility. "[C]redibility determinations are 'quintessentially the province of the trial court[.]'" *Shahid v. Borough of Darby*, 560 F. App'x 152, 153 (3d Cir. 2014) (citing to Fed. R. Civ. P. 52(a) and quoting *Dardovitch v. Haltzman*, 190 F.3d 125, 140 (3d Cir. 1999)).   Under the plain language of Rule 52(a), findings of fact and credibility determinations by a district court may be "based on oral or other evidence[.]"   *In re Tayfur*, 599 F. App'x 44, 47 (3d Cir. 2015) (quoting Fed. R. Civ. P. 52(a)(6)).

## Count I – Breach of Contract

180.     Pursuant to Section 1103 of the UCC, the purpose of the UCC is to "simplify, clarify and modernize the law governing commercial transactions."  Additionally, "unless displaced by the particular provisions of this title, the principles of law and equity… supplement its provisions." *Id.*

181.     A sales transaction is, by definition, a contract and under the Uniform Commercial Code, 13 Pa. C.S. §§ 2102, 2204, and 2206(a), with the terms of the contract being all terms expressly agreed to, orally or in writing, as supplemented by Article 2 of the Code. 13 Pa. C.S. § 2207(c).  Article 2 of the Uniform Commercial Code applies to transactions in goods.  13 Pa. C.S. § 2102.

182.     Under Section 2204(a) of the Pennsylvania UCC, "A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract."

183.     Under Section 2204(b) of the Pennsylvania UCC, "An agreement sufficient to constitute a contract for sale may be found even though the moment of its making is undetermined."

184.     Under Section 2207(c) of the Pennsylvania UCC, "Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this title."

185.     Under Section 2209 of the Pennsylvania UCC, an agreement modifying a contract does not need additional consideration to be binding.

186.     Under Section 2204(c) of the Pennsylvania UCC, even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy.

187.     Under Section 2301 of the Pennsylvania UCC, the obligation of the seller is to transfer and deliver and that of the buyer is to accept and pay in accordance with the contract.

188.     Under the Pennsylvania UCC, a buyer can recover consequential damages resulting from a seller's breach of contract. *See* 13 Pa. Const. Stat. Ann. §2715; *Nat'l Controls Corp. v. Nat'l Semiconductor Corp.*, 833 F.2d 491, 495 (3d Cir. 1987).

189.     Pursuant to Pennsylvania UCC Section 2713 (Damages of buyer for non-delivery or repudiation), the measure of damages for non-delivery or repudiation by the seller is the difference between the market price at the time when the buyer learned of the breach and the contract price, together with any incidental and consequential damages provided in this division (section 2715), but less expenses saved in consequence of the breach by the seller.

190.     Pursuant to the Pennsylvania UCC Section 2715, as a result of Defendant's breach, Plaintiff is also entitled to consequential damages.  Consequential damages include "any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not **reasonably** be prevented by cover or otherwise." 13 Pa. Stat. and Cons. Stat. Ann. §2715 (emphasis added).

191.     UCC Section 2715 (consequential damages) "is merely a restatement of the common law rule for consequential damages." *Mobile Conversions, Inc. v. Allegheny Ford Truck Sales*, No. 2:12-CV-1485, 2014 WL 7369898, at *3 (W.D. Pa. Dec. 29, 2014).

192.     Consequential damages may include lost profits. *Nat'l Controls Corp. v. Nat'l Semiconductor Corp.*, 833 F.2d 491, 495 (3d Cir. 1987) ("Lost profits are recoverable as consequential damages in a proper case, such as where a seller knows or has reason to know that a buyer is purchasing a good for resale.").

193.     A litigant must show such lost profits with reasonable certainty. *Gen. Dynafab, Inc. v. Chelsea Indus., Inc.*, 447 A.2d 958, 960 (Pa. Super. 1982).

194.     Pursuant to Pennsylvania UCC §2716 (Right of buyer to specific performance or replevin), "Specific performance may be decreed where the goods are unique or in other proper circumstances."

195.     The burden of proving that losses could have been avoided by reasonable effort and expense **must be borne by the party who has broken the contract** . *Glenn Distributors Corp. v. Carlisle Plastics, Inc*., 297 F.3d 294, 302–03 (3d Cir. 2002) (emphasis added). Therefore, Pennsylvania requires that the plaintiff attempt reasonable efforts to cover in order to mitigate damages, and the failure to do so is an affirmative defense to be proven by the defendant/seller. *Id.*

196.     Mitigation is an affirmative defense which must be pled by a defendant. *Aircraft Guar. Corp. v. Strato-Lift, Inc.*, 991 F. Supp. 735, 739 (E.D. Pa. 1998); (*see* ECF No. 8, wherein **mitigation of damages is not pled as an affirmative defense**).

197.     As stated *supra*, Pennsylvania common law supplements the Pennsylvania UCC unless the UCC specific displaces common law.  13 Pa.C.S.A. § 1103.  Here, even though the UCC applies as this was a sale of goods, the result is entirely consistent with Pennsylvania common law.

-28-

198.     "Under Pennsylvania common law, a breach of contract claim requires a plaintiff to prove (1) the existence of a contract; (2) a breach of a duty imposed by that contract; and (3) damages." *Legendary Art, LLC v. Godard*, 888 F. Supp. 2d 577, 582 (E.D. Pa. 2012) (citation omitted).

199.     An enforceable contract has three elements:  (a) a manifestation of an intent to be bound by the terms of the agreement, (b) sufficiently defined terms; and (c) an agreement supported by adequate consideration. *Legendary Art, LLC*, 888 F. Supp. 2d at 585.

200.     The first element of contract formation, manifestation of an intent to be bound, is established through evidence of offer and acceptance. *Quandry Sols. Inc. v. Verifone Inc.*, No. 07-097, 2009 WL 997041, at *8 (E.D. Pa. Apr. 13, 2009).

201.     Regarding the second element, sufficiently definite terms, Pennsylvania has adopted the Restatement (Second) of Contracts. *Ecore Int'l, Inc. v. Downey*, 343 F. Supp. 3d 459, 489 (E.D. Pa. 2018).  The Restatement provides as follows:

       a.     Even though a manifestation of intention is intended to be understood as an offer, it cannot be accepted so as to form a contract unless the terms of the contract are reasonably certain.

       b.     The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy.

       c.     The fact that one or more terms of a proposed bargain are left open or uncertain may show that a manifestation of intention is not intended to be understood as an offer or as an acceptance. *Id.* (quoting Restatement (Second) of Contracts §33 (1981)).

202.     "In general, contract law espouses three distinct, yet equally important, theories of damages to remedy a breach of contract:  'expectation' damages, 'reliance' damages, and 'restitution damages.'" *ATACS Corp. v. Trans World Commc'ns, Inc.*, 155 F.3d 659, 669 (3d Cir. 1998).

203.     "The preferred basis of contract damages are expectation damages, which seek to protect an injured party's 'expectation interest.'" *Id.*  This is "the interest in having the benefit of the bargain," and expectation damages put the aggrieved party in as good a position as would have occurred had the contract been performed. *Id.*  "[E]xpectation damages are measured by the losses caused and gains prevented by defendant's breach, to the extent [that] are in excess of any savings made possible by nonperformance." *Id.* (internal quotations omitted).

204.     As a result, "[t]he general rule of law applicable for loss of profits … allows such damages where (1) there is evidence to establish them with reasonable certainty, [and] (2) there is evidence to show that they were the proximate consequence of the wrong; and, in contract actions, that they were reasonably foreseeable." *Delahanty v. First Pa. Bank, N.A.*, 318 Pa. Super. Ct. 90, 120, 464 A.2d 1243, 1258 (1983)).

205.     Lost profits are recoverable as consequential damages in a proper case, such as where a seller knows or has reason to know that a buyer is purchasing a good for resale.  *See e.g.*, *Kunststoffwerk Alfred Huber v. R.J. Dick*, 621 F.2d 560, 563 (3d Cir. 1980).

206.     Under Pennsylvania law, lost profits are recoverable when they are "lost on [a] particular sale or contract for the performance of which the goods in question were purchased." *Neville Chemical Co. v. Union Carbide Corp.*, 422 F.2d 1205, 1226 (3d Cir.), *cert. denied*, 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55 (1970).

207.     In Pennsylvania, if damages are difficult to establish, an injured party must only prove damages with reasonable certainty, and doubts are construed against the breaching party.  *ATACS Corp. v. Trans World Commc'ns, Inc.*, 155 F.3d at 669.  "At a minimum, reasonable certainty embraces a rough calculation that is not too speculative, vague, or contingent upon some unknown factor." *Id.* at 669-70 (internal quotations omitted).  But applying the reasonable certainty standard does not preclude an award of damages because of some uncertainty as to the precise amount of damages incurred.  *Id.* at 670.  "What the law does require in cases of this character is that the evidence shall with a fair degree of probability establish a basis for the assessment of damages." *Id.*

## Non-material Breach

208.     "When performance of a duty under a contract is due, any nonperformance is a breach." *McCausland v. Wagner*, 78 A.3d 1093, 1101 (Pa. Super. Ct. 2013) (citation omitted).  "If a breach constitutes a material failure of performance, the non-breaching party is relieved from any obligation to perform; thus, a party who has materially breached a contract may not insist upon performance of the contract by the non-breaching party." *Id.* (citation omitted).  "Conversely, a party might breach the contract but still substantially perform its obligations under the agreement." *Id.* (citation omitted).  "In that case, the breach is deemed nonmaterial and the contract remains in effect." *Id.* "The breaching party retains the right to enforce the contract and demand performance; the non-breaching party has no right to suspend performance." *McCausland v. Wagner*, 78 A.3d 1093, 1101 (Pa. Super. Ct. 2013) (citation omitted).

209.     Pennsylvania courts apply the Restatement (Second) of Contracts §241 (1981) to determine materiality.  *Widmer Eng'g, Inc. v. Dufalla*, 837 A.2d 459, 468 Pa. Super. Ct. 2003); *Int'l Diamond Imp., Ltd. v. Singularity Clark, L.P.*, 40 A.3d 1261, 1271 (Pa. Super. Ct. 2012).

Section 241 of the Restatement provides:

In determining whether a failure to render or to offer performance is material, the following circumstances are significant:

(a)     the extent to which the injured party will be deprived of the benefit which he reasonably expected;

(b)     the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;

-30-

    (c)     the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

    (d)     the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances.

## Count VII – Fraud in the Inducement[10]

210.     In Pennsylvania, a plaintiff claiming fraud in the inducement must establish the following elements:  (1) a representation, (2) which is material to the transaction at hand, (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false, (4) with the intent of misleading another into relying on it, (5) justifiable reliance on the misrepresentation, and (6) the resulting injury was proximately caused by the reliance.  *Dunkin' Donuts Franchised Restaurants, LLC v. Claudia I, LLC*, 998 F. Supp. 2d 383, 389 (E.D. Pa. 2014).

211.     Under Pennsylvania law, a claim for fraudulent inducement encompasses the same elements as a claim for common law fraud, but also requires an additional element – that the misrepresentation at issue was made with specific intent to induce another to enter into a contract when the person had no duty to enter into the contract. *Goldstein v. Murland*, 2002 WL 1371747, at *1 (E.D. Pa. June 24, 2002).

## Count VIII - Pennsylvania Unfair Trade Practices and Consumer Protection Law

212.     73 P.S. §201-9.2, the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), provides a private right of action to "Any person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by any person of a method, act or practice declared unlawful by section 31 of this act, may bring a private action to recover actual damages or one hundred dollars ($100), whichever is greater.  The court may, in its discretion, award up to three times the actual damages sustained, but not less than one hundred dollars ($100), and may provide such additional relief as it deems necessary or proper. The court may award to the plaintiff, in addition to other relief provided in this section, costs and reasonable attorney fees."

213.     "To establish liability under the UTPCPL's catchall provision a plaintiff must present evidence showing:  (1) a deceptive act that is likely to deceive a consumer acting reasonably under similar circumstances; (2) justifiable reliance; and (3) that the plaintiff's justifiable reliance caused ascertainable loss."  *Slapikas v. First Am. Title Ins. Co.*, 298 F.R.D. 285, 292 (W.D. Pa. 2014) (citation omitted).

214.     "Evidence of reliance must go beyond simply a causal connection between the misrepresentation and the harm; a plaintiff must show that he justifiably bought the product in the

---

[10] As Plaintiff believes he has established his claim for breach of contract, fraud in the inducement, and liability under the UTPCPL, he is withdrawing his claims for implied contract and promissory estoppel, which were pled in the alternative and sustained on summary judgment.

first place (or engaged in some other detrimental activity) because of the misrepresentation." *Id.* (internal quotations omitted). The UTPCPL also provides for damages to the consumer in the amount of any actual damages suffered or one hundred dollars ($100.00), whichever is greater. In addition, the UTPCPL provides the court hearing the lawsuit with the power to multiply the consumer's actual damages by up to three times. 73 Pa. Cons. Stat. §201-9.2(a).

215.     Under the UTPCPL, a plaintiff must establish that a defendant's conduct caused him or her to take action. *Slapikas v. First Am. Title Ins. Co.*, 298 F.R.D. 285, 294 (W.D. Pa. 2014).

216.     The UTPCPL has no state of mind requirement. *See Gregg v. Ameriprise Fin., Inc.*, No. 29 WAP 2019, 2021 WL 607486 (Pa. Feb. 17, 2021). All that the statute requires the plaintiff to prove is that the acts or practices are capable of being interpreted in a misleading way.

217.     The economic loss doctrine does not apply to UTPCPL matters. Unanimous panels of the Superior Court have twice refused to apply the economic loss doctrine in UTPCPL cases. *See Knight v. Springfield Hyundai*, 81 A.3d 940, 952 (Pa. Super. Ct. 2013) (when claims are brought "pursuant to the UTPCPL [] and do not sound in negligence[,] … the economic loss doctrine is inapplicable" ); *Dixon v. Northwestern Mutual*, 146 A.3d 780, 790 (Pa. Super. Ct. 2016).

218.     The fee-shifting provision of the UTPCPL is designed to promote its purpose of punishing and deterring deceptive business practices. *Dibish v. Ameriprise Financial, Inc.*, 134 A.3d 1079, 1092 (Pa. Super. 2016).

219.     The Court should consider the following factors in assessing the reasonableness of attorney fees under the UTPCPL:  (1) The time and labor required, the novelty and difficulty of the questions involved and the skill requisite properly to conduct the case; (2) the customary charges of the members of the bar for similar services; (3) the amount involved in the controversy and the benefits resulting to the clients from the services; and (4) the contingency or certainty of the compensation.  (*Id.*)

Dated:  May 13, 2021                      Respectfully submitted,


By:   */s/ Alexandra S. Jacobs*
       Alexandra S. Jacobs (PA ID No. 318355)
       John J. Levy (PA ID No. 42377)
       MONTGOMERY, MCCRACKEN,
          WALKER & RHOADS, LLP
       A Pennsylvania Limited Liability Partnership
       1735 Market Street
       Philadelphia, PA 19103
       (215) 772-1500
       Email: jlevy@mmwr.com
                 ajacobs@mmwr.com
       *Attorneys for Plaintiff, Michael Ruggiero*

-32-

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF EASTERN PENNSYLVANIA**

|  |  |
|---|---|
| MICHAEL RUGGIERO, | : |
| | : |
| | : Civil Action No. 18-cv-3047-JHS |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| BRIAN NOCENTI, | : |
| | : |
| Defendant. | : |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 13th day of May 2021, I caused a true and correct copy of the foregoing Plaintiff's Proposed Findings of Fact and Conclusions of Law to be served electronically on counsel of record as follows:

Christopher J. Amentas, Esquire
Carosella & Associates, P.C.
882 S. Matlack Street, Suite 101
West Chester, PA 19382
E-Mail:  chris@carosella.com
*Attorneys for Defendant, Brian Nocenti*

Date:  May 13, 2021                    s/ *Alexandra S. Jacobs*
                                 Alexandra S. Jacobs

5523385v1