IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MICHAEL RUGGIERO,

              Plaintiff,

    v.

BRIAN NOCENTI,

              Defendant.

CIVIL ACTION
NO. 18-3047

## OPINION

**Slomsky, J.**                                                   **August 25, 2021**

## I.    INTRODUCTION

This breach of contract case arises from a dispute between Plaintiff Michael Ruggiero and Defendant Brian Nocenti over the transfer of 143 "Magic: the Gathering" trading cards. Plaintiff and Defendant are longtime fans of a game titled "Magic: the Gathering" and, on May 7, 2017 they reached an oral agreement for Plaintiff to purchase from Defendant a select group of Defendant's trading cards. (See Doc. No. 58 ¶ 25.) Later on, in writing, the parties confirmed their agreed-upon conditions, which included that Plaintiff would pay $70,000 to Defendant within one year of their agreement. (See id. ¶ 29.)

On May 29, 2018, despite the parties' numerous communications extending the one-year payment deadline to the end of June 2018, Defendant accused Plaintiff of breaching the one-year payment deadline, refused to consummate the sale, and refunded Plaintiff's partial payments toward the $70,000. (See Tr. Exs. P-5 to P-7; Doc. No. 58 ¶¶ 67-68.) In response, Plaintiff initiated this action by filing a Complaint against Defendant, alleging breach of contract, fraud in the inducement, and violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law. (Doc. No. 1.) In answer to the Complaint, Defendant maintains that the parties never formed

an agreement, but in any event, Plaintiff is not entitled to damages because by May 2018 the value of the trading cards fell below the parties' agreed upon purchase price. (See Doc. No. 59 at 11-12, 14-16 ¶¶ 1-8, 15-23.)

Beginning on April 5, 2021, the Court held a three-day bench trial. (See Doc. Nos. 52-53, 56.) At the trial, the Court heard testimony from the parties, as well as three expert witnesses who opined on the value of the cards in May 2018 and beyond. (See ids.) As required by Federal Rule of Civil Procedure 52(a), the Court now makes the following findings of fact and conclusions of law.

## II.   FINDINGS OF FACT[1]

### A.   Background on "Magic: the Gathering" and Professional Card Grading

"Magic: the Gathering" ("Magic") is a collectable card game released by publishing company Wizards of the Coast. (See Doc. No. 58 ¶ 1.) Beginning in 1993, Wizards of the Coast released new sets of cards, also known as editions, with new sets being released every year thereafter. (See id. ¶ 2.) The first set released is known as the "Limited Edition" set and was printed in two runs: the "Alpha" print run and the "Beta" print run. (See id. ¶ 3.) Alpha and Beta cards were released in 1993 and can only be purchased on secondary markets. (See id. ¶¶ 5-7.)

To ensure Alpha and Beta card authenticity, Magic card owners submit their cards for professional grading. (See id. ¶ 9.) Beckett Grading Services ("BGS"), a professional card-grading company, assigns to the cards submitted to them: (1) an overall card quality grade; and (2) four individual subgrades for the card's centering, corners, edges, and surfaces. (See id.) Grades are given in 0.5 increments on a scale of 1 to 10, with 10 being the highest grade. (See id.)

---

[1]   All findings of fact are made by a preponderance of the evidence.

Collectors use a specific lexicon to refer to a card's BGS overall grade and subgrades.  (See id. ¶ 11.)  Collectors refer to the card's overall grade, with suffixes describing the subgrades.  (See id.)  The suffix "quad" means none of the subgrades are lower than the overall grade.  (See id.)  The suffix "+" means one of the subgrades is graded a 10.  (See id.)  For example, a "9.5 quad ++" card is one with a 9.5 overall grade and four subgrades of at least a 9.5 grading ("quad"), with two of those subgrades being graded a 10 ("++").  (See id.)

### B.    The Parties

Plaintiff is an adult individual with an interest in Magic cards.  (See id. ¶¶ 15-17.)  Around 2007, Plaintiff began professionally collecting Magic cards, focusing on Beta edition cards graded 9.5 or better.  (See id. ¶ 16.)  He considers card collecting to be his primary source of personal investment.  (See id. ¶ 17.)  Defendant also is an adult individual who collects, sells, and facilitates third-party Magic card sales.  (See id. ¶¶ 19-20.)  In 2014, the parties met at a Magic tournament and began conversing on Facebook's "Messenger" application.  (See id. ¶ 18.)

### C.    The Negotiations Over the Sale of Defendant's Magic Cards

In February 2017, Plaintiff sent Defendant a Facebook message, inquiring whether Defendant could sell him a "Black Lotus" Beta edition card with a 9.5 quad ++ grade.  (See id. ¶ 20.)  Their conversation progressed, and on March 11, 2017, the parties met at Defendant's house so Plaintiff could inspect Defendant's entire graded Beta edition card collection.  (See id. ¶ 22.)  After the meeting, Defendant sent Plaintiff a list of Beta cards Plaintiff "pulled out" at the meeting, stating their total value was just under $190,000.  (See Tr. Ex. P-7 at 68; Doc. No. 58 ¶ 23.)

During the ensuing two months, the parties began to negotiate over Facebook Messenger for the sale of Defendant's Beta cards.  (See Tr. Ex. P-7.)  They discussed cards to be included in the purchase, the purchase price, and payment timelines.  (See id. at 52-66.)  They also revised

Defendant's list of Beta cards from the March 11 meeting, adding and removing cards as the negotiations progressed.  (See Tr. Ex. P-7 at 59; see also Tr. Ex. P-8.)

On May 7, 2017, the parties again met at Defendant's house to negotiate in person.  (See Doc. No. 58 ¶ 25.)  Although no written agreement emerged from the meeting, the parties reached an oral agreement for the sale of Defendant's cards.  On the night of May 7th, Defendant sent to Plaintiff a message saying "[y]ou are going to have a wonderful set . . . .  I'm very happy to see these cards going to such a collector."  (Tr. Ex. P-7 at 49.)  A day later, Defendant asked Plaintiff to send him a "list of the cards" in the sale.  (Id.)  On May 29, 2017, in response, Plaintiff sent to him an email that described groups of cards Defendant agreed to sell:  (1) all Defendant's Beta cards with BGS grades of 9.5 and higher; (2) all Defendant's BGS cards with a grade of 9 that Defendant was appealing to BGS to assign a higher grade; and (3) all Defendant's incorrectly graded BGS cards that met the previous criteria.  (See Tr. Ex. P-1.)  Thereafter, the parties agreed on a list of Defendant's cards that fit these categories and a final purchase price of $177,415.  (See Tr. Ex. P-8.)

 In the May 29, 2017 email, Plaintiff acknowledged Defendant's request made at the May 7 in-person meeting that at least $70,000 be paid "in the first year."  (Tr. Ex. P-1; see also Doc. No. 58 ¶ 29.)  Plaintiff also memorialized price discounts for early payment discussed at the May 7 meeting:  (1) a 6% discount for cards purchased within 12 months; (2) a 3% discount for cards purchased after 12 months but before 24 months; and (3) no discount for cards purchased after 24 months.  (See Tr. Ex. P-1.)

### D.    The Agreement's Performance

After Plaintiff sent the May 29, 2017 email, the parties continued to communicate on Facebook Messenger, discussing their performance of the terms of the agreement that were finalized during their in-person meeting and memorialized in Plaintiff's May 29 email.  (See Tr.

Ex. P-7.)  For example, at least four times between July 2017 and May 2018, Defendant confirmed that Plaintiff's $70,000 first-year payment was due by the end of June 2018.  (See Doc. No. 58 ¶ 35.)  Specifically, on March 18, 2018, Plaintiff confirmed with Defendant that he "want[ed] $70k by the end of June" and Defendant replied, "[t]hat would be perfect."  (Id.)  Furthermore, on June 28, 2017, in accordance with the incentive structure described in Plaintiff's May 29, 2017 email, Defendant noted that the parties had "stamped out a three year [payment] plan."  (Id. ¶ 39.)

Defendant requested that Plaintiff pay him through his preferred payment methods of a "PayPal Gift,"[2] cashier's check, wire transfer, or cash.  (See id. ¶ 43.)  On June 26, 2017, Plaintiff began making payments, sending $5,000 to Defendant via PayPal Gift.  (See id. ¶¶ 43-44.)  Thereafter, from August 15, 2017 through May 18, 2018, Plaintiff made seven additional $5,000 payments to Defendant via PayPal Gift, for a total of $40,000.  (See id. ¶ 47.)

### E.     Defendant Questions the Agreement

On May 5, 2018, after nearly a year of receiving payments from Plaintiff, Defendant informed Plaintiff that the cards' values were increasing.  (See id. ¶ 50.)  By the end of the month, Defendant told Adam Cai, another Magic card collector, that he believed the cards' values had increased by $50,000 since the date of his agreement with Plaintiff.  (See id.)

On May 29, 2018, Defendant sent Cai a Facebook message, asking "[i]f you had an agreement made on today last year for a total of 70k to be paid in a year and the person didn't pay would you pull out of the deal and refund them?"  (Tr. Ex. P-29.)  Cai replied that it was a difficult question and asked whether Defendant referred to his agreement with Plaintiff.  (See id.)  In

---

[2]     At trial, Defendant noted that a "PayPal Gift" payment method differs from a "PayPal Goods and Services" payment in that a Goods and Services payment is reversible, whereas a Gift payment is not.  (See Doc. No. 93 ¶¶ 6-19.)

response, Defendant acknowledged that "all the cards in the deal have gone up," including his quad Beta cards that "have gone up significantly in the past 3 months." (Id.)

Cai advised that if it were his agreement, he would not terminate it, but Defendant remained obstinate. (See id.) Defendant noted that although he "[did not] have an official contract" with Plaintiff, Plaintiff did not pay him $70,000 in the first year of their agreement, thereby not "meet[ing] the terms set forth" between the parties. (Id.) In support, Defendant quoted Plaintiff's May 29, 2017 email that mentioned the one-year payment timeline. (See id.) Defendant acknowledged that the parties agreed to a $170,000 purchase price and sent Cai a spreadsheet titled "All-Brians-Betas-Im-Interested-In-1," which contained a list of the cards selected. (See id.) After more back and forth with Cai, Defendant noted that "[i]f I pull out of the deal I'd be keeping all the power . . . [I] already regret not selling my alpha's not going to make the same mistake twice . . . ." (Id.)

## F.   Defendant Repudiates the Agreement

On May 29, 2018, the same day he spoke with Cai, Defendant emailed Plaintiff stating that he was returning to Plaintiff the $40,000 already paid and "cancelling [their] agreement" because he believed Plaintiff had breached it. (Id. ¶ 63.) In the email, he explained that "the one[-]year deadline for the initial [$70,000 payment] is past due." (Tr. Ex. P-6.)

Later that day, Plaintiff messaged Defendant on Facebook, stating he did not breach their contract because they recently agreed that the required first-year payment could be paid by the end of June 2018. (See Tr. Ex. P-7 at 1-3.) Plaintiff also sent an email response to Defendant, wherein he offered to immediately pay him $30,000—the outstanding balance due within the first year— and later that evening he so did via PayPal Goods and Services. (See Tr. Ex. P-5; see also Doc. No. 58 ¶ 66.) Despite now receiving $70,000 from Plaintiff, Defendant still considered Plaintiff

in breach of their agreement and returned all of the payments.  (See Tr. Ex. P-5; see also Doc. No. 58 ¶¶ 67-68.)

And, in a third response, Defendant stated that "[b]ottom line, [their] OFFICIAL contract was agreed upon on May 7, 2017 and [they] both agreed that the $70,000 would be paid within a year." (Tr. Ex. P-4.)  He also noted that he only consented to Plaintiff's proposed end of June 2018 first-year payment deadline because he mistakenly "assumed that was when [the] official contract had started." (Id.)  He concluded, stating "I feel that I have made my final decision precisely clear. I have nothing more to say." (Id.)

Throughout his messages, Defendant also asserted that Plaintiff breached their agreement because after the agreement was made Plaintiff purchased a Magic card for $37,500 from Cai, meaning he did not make paying "Defendant his 'first priority . . . .'" (Doc. No. 59 at 5 ¶¶ 10-11.) Despite Plaintiff asking Defendant for his opinion on Cai's card before the purchase, Defendant complained that the purchase prevented Plaintiff from fulfilling his one-year payment obligation to him.  (See id.)  Finally, Defendant also argues that Plaintiff's $30,000 payment of the balance on May 29, 2018 was not made in accordance with the prior agreement because it was not made via one of the designated preferred payment methods.  (See Doc. No. 59 at 4 ¶ 6.)

### G.    Plaintiff Files Suit and Defendant Sells His Beta Cards

On July 20, 2018, Plaintiff commenced this action by filing a Complaint.  (See Doc. No. 1.)  The Complaint included eight counts: (1) Breach of Contract and Specific Performance/Injunctive Relief; (2) Unjust Enrichment; (3) Contract Implied in Fact; (4) Contract Implied in Law; (5) Breach of the Implied Covenant of Good Faith and Fair Dealing; (6) Promissory Estoppel; (7) Fraud in the Inducement; and (8) Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law.  (See id.)  Thereafter, the Court granted Defendant's Motion for Summary Judgment with respect to Counts II (Unjust Enrichment), IV (Contract

Implied in Law), and V (Breach of the Implied Covenant of Good Faith and Fair Dealing). (See Doc. No. 36 at 1.) After trial, Plaintiff withdrew his claims in Counts III (Contract Implied in Fact) and VI (Promissory Estoppel). (See Doc. No. 58 at 37 n.10.) Thus, only three Counts remained: Counts I (Breach of Contract), VII (Fraud in the Inducement), and VIII (Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law).

Earlier, one week after Defendant's May 29, 2018 email to Plaintiff, Plaintiff's counsel sent Defendant a letter requesting that he preserve his Magic cards as evidence for an impending lawsuit. (See Doc. Nos. 34-1 at 2; 58 ¶ 120.) Then, on the same day he filed the Complaint, Plaintiff sought from this Court a Temporary Restraining Order and Preliminary Injunction, requesting Defendant be prohibited from selling the Magic cards he agreed to sell to Plaintiff because the collection is "one-of-a-kind." (Doc. No. 2 at 2.) The Court denied Plaintiff's request. (See Doc. No. 7.)

Defendant testified that after the litigation began, he sold sometime in July 2018 all but one of the Magic cards subject to his agreement with Plaintiff to two men named Ben and Shawn for $135,000—roughly $42,000 less than the amount Plaintiff agreed to pay. (See Doc. Nos. 34-1 at 2; 58 ¶¶ 116, 121.) Defendant claims that he met the two men at a Whole Foods grocery store, he happened to have all but one of the subject cards with him, Ben and Shawn had $135,000 in cash with them, and they completed a sale after ten to fifteen minutes of negotiation. (See Doc. Nos. 34-1 at 6-7; 53 at 114 ¶¶ 16-17.) Defendant does not know the men's surnames, never transacted with them before the sale at issue, and only negotiated with them once in person at Whole Foods. (See Doc. No. 34-1 at 6-7.) Defendant also has not produced any documents

confirming the sale, such as communications with Ben and Shawn, a contract between them, or a bill of sale.  (See id. at 8.)[3]

## III.  CONCLUSIONS OF LAW

### A.  Pennsylvania Law on Contract Formation and Modification

As a preliminary matter, the Pennsylvania Uniform Commercial Code ("UCC") governs contracts for the sale of goods and is supplemented by principles of law and equity.  See 13 Pa. C.S. § 2102.  A contract for the sale of goods "may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." § 2204(a).  This is true even if "the writings of the parties do not otherwise establish a contract.  In such case the terms of the particular contract consist of those on which the writings of the parties agree, together with any supplementary terms incorporated under" other Pennsylvania UCC provisions.  § 2207(c).  Moreover, an agreement modifying a contract for the sale of goods is binding without additional consideration but must be made in good faith.  See § 2209(a).  See also UCC § 2-209, cmt. 2; Williams v. Katawczik, 53 Pa. D. & C. 4th 558, 564 (Pa. Ct. Com. Pl. 2001).

An enforceable contract has three elements: (1) a manifestation of an intent to be bound by the terms of the agreement, (2) sufficiently defined terms, and (3) an agreement supported by adequate consideration.  See Legendary Art, LLC v. Godard, 888 F. Supp. 2d 577, 582 (E.D. Pa. 2012).  "The question of whether an undisputed set of facts establishes a contract is typically one of law, but where the facts are in dispute, the question is for the [trier of fact] to decide."  Id. "Contract formation is a matter of law ripe for determination by the Court if a binding contract could not exist under the undisputed set of facts."  Ecore Int'l, Inc. v. Downey, 343 F. Supp. 3d 459, 489 (E.D. Pa. 2018).  Further, "[w]hat was said and done by the parties as well as what was

---

[3]  Defendant testified that he reported the sale to "Ben and Shawn" on his federal tax return for 2018.  (See Doc. No. 53 at 120 ¶¶ 15-20.)

intended by what was said and done by them are questions of fact . . . ."  Bennett v. Itochu Int'l, Inc., No. 09-1819, 2012 WL 3627404, at *15 (E.D. Pa. Aug. 23, 2012), aff'd, 572 F. App'x 80 (3d Cir. 2014) (emphasis in original).

Generally, the first element of contract formation—manifestation of an intent to be bound—is established through evidence of offer and acceptance.  See Quandry Sols. Inc. v. Verifone Inc., No. 07-97, 2009 WL 997041, at *8 (E.D. Pa. Apr. 13, 2009).  "In some circumstances, however, '[a] manifestation of mutual assent may be made even though neither offer nor acceptance can be identified and even though the moment of formation cannot be determined.'"  Id. (quoting Restatement (Second) of Contracts § 22(2) (1981)).  Evidence of preliminary negotiations, or an agreement to enter into a binding contract in the future, does not alone constitute a contract.  See id.  "Conversely, it is equally well established in contract law that an agreement with open terms may nevertheless constitute an enforceable contract."  Fleming Steel Co. v. Jacobs Eng'g Grp., Inc., 373 F. Supp. 3d 567, 584 (W.D. Pa. 2019).

Regarding the second element—sufficiently definite terms—Pennsylvania has adopted the Restatement (Second) of Contracts.  See Ecore Int'l, Inc., 343 F. Supp. 3d at 489.  The Restatement provides as follows:

(1)   Even though a manifestation of intention is intended to be understood as an offer, it cannot be accepted so as to form a contract unless the terms of the contract are reasonably certain.

(2)   The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy.

(3)   The fact that one or more terms of a proposed bargain are left open or uncertain may show that a manifestation of intention is not intended to be understood as an offer or as an acceptance.

Id. (quoting Restatement (Second) of Contracts § 33 (1981)).

"Incompleteness of terms is one of the primary reasons statements of preliminary negotiations are not deemed offers." Id. (quotations omitted).  However, the fact that an agreement omits an essential term, such as price, does not negate contract formation so long as the parties otherwise manifested their mutual assent to the agreement and the terms of that agreement were sufficiently definite.  See id.  But, where there is no discussion of any essential terms, such as time or manner of performance, price, or consideration, the agreement is too indefinite for a party to reasonably believe that it could be enforceable.  See id.

The third and final element of contract formation—consideration—is an act, forbearance, or return promise bargained for and given in exchange for the original promise.  See id.

**B.    The Parties Formed a Contract that They Modified**

The Court finds that the parties formed a contract during their May 7, 2017 in-person meeting, they modified it to extend Plaintiff's one-year payment obligation to the end of June 2018, and Defendant breached the contract through his actions on May 29, 2018.

**1.    The Parties Reached an Agreement on May 7, 2017 that is Memorialized in Plaintiff's May 29, 2017 Email and the Parties' Facebook Messages**

The parties reached a sufficiently definite contract to sell the following groups of Defendant's Magic cards:  (1) all Defendant's Beta cards with BGS grades of 9.5 and higher;  (2) all Defendant's BGS cards with grades of 9 that Defendant was appealing to BGS for a higher grade;  and (3) all Defendant's incorrectly graded BGS cards that met the previous criteria.  (See Tr. Ex. P-1.)

Regarding the first element of formation, the parties manifested an intent to be bound to the terms of an agreement for the sale of Defendant's Beta Magic cards.  On May 7, 2017, the parties held a second in-person meeting so that Plaintiff could inspect Defendant's Magic card collection.  (See Doc. No. 58 ¶ 25.)  Although the meeting did not result in a written contract, the

11

facts show the parties reached an agreement that they carried out over to the following year.  For instance, on the night of May 7th, Defendant messaged Plaintiff, stating that "[y]ou are going to have a wonderful set . . . .  I'm very happy to see these cards going to such a collector."  (Tr. Ex. P-7 at 49.)  The following day, Defendant also asked Plaintiff to send him a "list of the cards" in the deal, and on May 29, 2017 Plaintiff so did.  (Id.; see also Tr. Ex. P-1.)  Furthermore, the parties' execution of the agreement over the following twelve months, primarily by Plaintiff's $5,000 installment payments, which were accepted by Defendant, highlight the parties' mutual understanding that an agreement existed.  (See Doc. No. 58 ¶¶ 43-44.)

Additionally, Defendant's continuous references to the existence of an agreement particularly when claiming Plaintiff breached the agreement, further exemplifies the presence of mutual assent.  (See, e.g., Tr. Exs. P-4–P-6.)  For example, in his May 2018 emails to Plaintiff, Defendant notes he "will be cancelling [the] agreement," (Tr. Ex. P-6), alleges that "[t]he agreement [the parties] established took place in mid May," (Tr. Ex. P-5), and affirms that the "OFFICIAL contract was agreed upon on May 7, 2017" (Tr. Ex. P-4).  Defendant also acknowledged to Cai that he had an agreement with Plaintiff.  (See Tr. Ex. P-29.)  All told, the parties' statements and actions after the May 7, 2017 meeting show the parties manifested an intent to be bound to sell and purchase certain groups of Defendant's Magic cards.

Second, the parties' agreement contained sufficiently defined terms as recounted in Plaintiff's May 29, 2017 email.  In the email, Plaintiff first notes three groups of Defendant's Magic cards he is purchasing:  (1) all Defendant's Beta cards with BGS grades of 9.5 and higher; (2) all Defendant's BGS cards with grades of 9 that Defendant was appealing to BGS for a higher grade;  and (3) all Defendant's incorrectly graded BGS cards that meet the previous criteria.  (See Tr. Ex. P-1.)  This language on its own shows the sufficiency of the parties' agreement because it

confirms their intent to sell and purchase specific groups of Defendant's Magic cards.  Although at the time of contracting they had yet to identify which cards met the criteria noted, the parties agreed upon definite groups of cards that allowed them to identify the cards Plaintiff was purchasing.  Further, in the email Plaintiff acknowledges Defendant's first-year $70,000 payment term and the three discount rates if payments were made within two years of the agreement's execution.  (See id.)  Considered together, these terms sufficiently created a contract, including Plaintiff's manner of payment.

Defendant's argument that the agreement lacked essential terms is unpersuasive.  (See Doc. No. 59 at 11 ¶ 4.)  Initially, it is inconsequential that when Plaintiff sent his May 29, 2017 email, the parties were still amending the final spreadsheet showing the cards to be sold.  They did agree on the categories of cards included in the agreement and were merely deciding on which cards fit into those categories.  (See Tr. Ex. P-8.)  Agreeing to categories of cards for sale, while later identifying the cards that met the criteria for each category, is a sufficiently defined term of the contract.[4]

Additionally, although it is uncertain when the parties agreed on the $177,415 purchase price, this omission in Plaintiff's May 29, 2017 email is not fatal to the agreement in light of their identification of the card categories for purchase.[5]  Because the parties agreed to later identify which cards fit into the categories, it follows that they would agree on a purchase price for those

---

[4]  The final list of cards to be sold is discussed in more detail in Section IV.B.1 infra.

[5]  While the agreement is not deemed indefinite because the parties did not initially agree on a purchase price, it is noted that the $177,415 price is in line with the parties' expectations.  After the initial March 11, 2017 meeting, Defendant sent Plaintiff a list of Beta cards Plaintiff "pulled out" at the meeting, stating their total value was just under $190,000.  (See Tr. Ex. P-7 at 68; Doc. No. 58 ¶ 23.)  Further, Defendant admitted to Cai that he agreed on a deal worth roughly $170,000.  (See Tr. Ex. P-29.)

cards after the identification.  Further, despite being devoid of a final price, Plaintiff's May 29, 2017 email enumerated sufficiently definite payment timelines and methods.  (See Tr. Ex. P-1.)  In the email, Plaintiff recounted that the parties agreed to a two-year discount price for payments Plaintiff tendered within twenty-four months, with no discounts for payments made thereafter. (See id.)  Less than one month later, Defendant confirmed in a Facebook message to Plaintiff that the parties "stamped out a three[-]year [payment] plan."  (Doc. No. 58 ¶ 39.)  In sum, Plaintiff's email and Defendant's responsive messages the following year confirm that during the May 7, 2017 meeting the parties agreed to a three-year, discount-laden, and sufficiently defined three-year payment plan.  Given these terms, the agreement was sufficiently definite absent a final purchase price.

Finally, the agreement was supported by adequate consideration of return promises by Defendant—agreeing to sell categories of Magic cards he owned—and by Plaintiff—agreeing to pay him for those cards.  Therefore, on May 7, 2017, the parties formed an enforceable agreement for the sale and purchase of specified groups of Defendant's Magic cards.

### 2. The Parties Modified the Agreement to Extend Plaintiff's One-Year Payment Deadline to the End of June 2018

In Plaintiff's May 29, 2017 email, he notes that Defendant required him to pay $70,000 "in the first year" of the agreement.  (Tr. Ex. P-1; see also Doc. No. 58 ¶ 29.)  Although the parties dispute when the "first year" payment period commenced, it is clear that they agreed the deadline was extended to the end of June 2018.  At least four times between July 2017 and May 2018, Defendant confirmed that Plaintiff's $70,000 first-year payment was due by the end of June 2018. (See Doc. No. 58 ¶ 35.)  Specifically, on March 18, 2018, Plaintiff confirmed with Defendant that he "want[ed] $70k by the end of June" and Defendant replied, "[t]hat would be perfect."  (Id.)

This language sufficiently modified the payment deadline, and there is nothing to suggest either party did not act in good faith in so doing.  Defendant's argument that he only agreed to the June 2018 deadline because he mistakenly believed the deadline ended in June is unpersuasive. Nothing suggests, however, that Plaintiff caused Defendant any confusion about the extended deadline.  Therefore, the parties mutually agreed to a modification of the first-year payment date to the end of June 2018.

### C.      Pennsylvania Law on Breach of Contract

Under Pennsylvania law, a breach of contract claim requires a plaintiff to prove (1) the existence of a contract; (2) a breach of a duty imposed by that contract; and (3) damages.  See Legendary Art, LLC, 888 F. Supp. 2d at 582.  Generally, in a contract for the sale of goods, the seller's duty is to transfer and deliver the goods to the buyer, and the buyer's obligation is to accept and pay for the goods.  See 13 Pa. C.S. § 2301.  Failure to perform these obligations renders a party in breach of contract.

Anticipatory repudiation is a type of breach wherein a party "entails an essential declaration of an intention to breach" the agreement.  Harrison v. Cabot Oil & Gas Co., 631 Pa. 268, 278 (2015) (citing 2401 Pa. Ave. Corp. v. Fed'n of Jewish Agencies of Greater Phila., 507 Pa. 166, 174 (1985)).  "Under Pennsylvania law, anticipatory repudiation or breach requires an absolute and unequivocal refusal to perform or a distinct and positive statement of an inability to do so."  Id. (quotation marks and citation omitted).

### D.      Defendant Breached the Agreement by Refusing to Continue with the Sale and Returning Plaintiff's Payments

Defendant's statements and actions in May 2018 reflect an absolute and unequivocal refusal to sell the Magic cards, meaning he anticipatorily repudiated and breached the agreement. As set forth above, the parties entered into an agreement that, inter alia, required Plaintiff to pay

Defendant $70,000 by the end of June 2018.  (See Tr. Ex. P-1.)  In exchange, Defendant agreed to sell to Plaintiff select categories of his Magic cards, with the actual selection of the specific cards to follow.  (See id.)

By May 29, 2018, Plaintiff had paid Defendant $40,000 of the $70,000 due by the end of June 2018.  (See Doc. No. 58 ¶ 47.)  However, on May 29, 2018, based upon a claim by Defendant that Plaintiff's payment was due on that day, Defendant sent Plaintiff an email stating that he was returning the payments made and "cancelling [their] agreement" because he believed Plaintiff had breached it.  (Id. ¶ 63.)  Plaintiff responded, stating he did not agree but offering to immediately pay Defendant the remaining balance of $30,000.  (See Tr. Exs. P-5; P-7 at 1-3.)  In fact, Plaintiff sent Defendant the balance due later that day.  (See Doc. No. 58 ¶ 66.)

Undeterred, Defendant sent another email reiterating his mistaken belief and returned the $70,000 received from Plaintiff.  (See Tr. Ex. P-5; see also Doc. No. 58 ¶¶ 67-68.)  Finally, two days later, Defendant again responded to Plaintiff, noting "I feel that I have made my final decision precisely clear.  I have nothing more to say." (Tr. Ex. P-4.)  The parties also exchanged numerous Facebook messages in which they reiterated their positions on the one-year payment deadline. (See Tr. Ex. P-7 at 1-3.)

Defendant's three emails and Facebook messages show his cancellation of the agreement, which he repeatedly conveyed to Plaintiff.  (See Tr. Exs. P-4–P-6; Doc. No. 58 ¶¶ 63, 67-68.)  In this regard, Defendant did not waiver, returning the $30,000 and $40,000 payments Plaintiff had made.[6]  (See Tr. Ex. P-5; Doc. No. 58 ¶ 66.)  Defendant's statements, refusal to accept Plaintiff's

---

[6]   Defendant contends that Plaintiff's additional $30,000 payment was insufficient because it was made via PayPal Goods and Services, which was not one of Defendant's preferred payment methods.  (See Doc. No. 59 at 6 ¶¶ 19-20.)  This is inconsequential.  Assuming, without deciding, that the agreement required payment via Defendant's preferred methods, it is clear that Plaintiff was not required to tender the payment for another month since the parties

additional payment, and return of Plaintiff's $40,000 payment signaled to Plaintiff an absolute and unequivocal cancellation of the agreement.  For these reasons, at the end of May 2018, Defendant anticipatorily cancelled and breached the agreement.

Plaintiff abided by his obligations under the agreement.  When Defendant repudiated the agreement, Plaintiff did not owe Defendant the entire $70,000 because the parties extended the payment deadline to the end of June 2018.  (See Doc. No. 58 ¶ 35.)  Moreover, despite Defendant's contention that he lost faith in Plaintiff's ability to make the full payment because Plaintiff purchased another Magic card from Cai, nothing in the record even suggests that either party was prohibited from entering into an agreement with a third party.  (See Doc. No. 59 at 5 ¶¶ 10-11.) Accordingly, Defendant's subjective disappointment with Plaintiff's separate transaction did not breach the agreement.

### E. Defendant Neither Fraudulently Induced Plaintiff to Enter the Agreement nor Violated the Pennsylvania Unfair Trade Practices and Consumer Protection Law

In addition to his breach of contract claim, Plaintiff also alleges Defendant fraudulently induced him to enter their agreement (Count VII) and violated the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") (Count VIII).  (See Doc. No. 58 ¶¶ 210-19.) Conversely, Defendant contends that his alleged fraudulent and deceptive activities, primarily relating to the alleged breach, occurred after the parties executed their alleged agreement, and thus he could not have fraudulently or deceptively induced Plaintiff to enter into it.  (See Doc. No. 59 at 13 ¶ 11.)

---

extended the one-year payment deadline to the end of June 2018.  See supra Section III.B.2. Thus, even if Plaintiff made the payment via an improper method, time remained for him to cure the defect.

"[F]raud in the inducement is a species of [a] fraudulent misrepresentation claim in which one party's false representations induce the other party to enter into a contract."  Smith v. Sweden Valley, LLC, No. 14-1617, 2015 WL 12669894, at *5 (M.D. Pa. June 19, 2015).  In Pennsylvania, a plaintiff alleging fraud in the inducement must establish, by clear and convincing evidence, the following elements:

> (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance.

Dunkin' Donuts Franchised Rests., LLC v. Claudia, LLC, 998 F. Supp. 2d 383, 389 (E.D. Pa. 2014) (quotation marks omitted) (citing Overall v. Univ. of Pa., 412 F.3d 492, 498 (3d Cir. 2005)); see also EBC, Inc. v. Clark Bldg. Sys., Inc., 618 F.3d 253, 275 (3d Cir. 2010) (stating Pennsylvania fraud claims require proof by clear and convincing evidence).  Additionally, the defendant must have made the misrepresentation with specific intent to induce another to enter into the agreement. See Goldstein v. Murland, No. 02-247, 2002 WL 1371747, at *1 (E.D. Pa. June 24, 2002).

The Pennsylvania UTPCPL, the next open claim in this case, provides:

> Any person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by any person of a method, act or practice declared unlawful by section 3 of this act, may bring a private action to recover actual damages or one hundred dollars ($100), whichever is greater.

73 P.S. § 201-9.2(a).  To establish liability under the UTPCPL, a party must prove:  "(1) a deceptive act that is likely to deceive a consumer acting reasonably under similar circumstances; (2) justifiable reliance; and (3) that the plaintiff's justifiable reliance caused ascertainable loss." Slapikas v. First Am. Title Ins. Co., 298 F.R.D. 285, 292 (W.D. Pa. 2014).  To show reliance on a misrepresentation, a party must prove more than a "simpl[e] causal connection between the

18

misrepresentation and the harm; a plaintiff must show that he justifiably bought the product in the first place (or engaged in some other detrimental activity) because of the misrepresentation."  Id. (quotation marks and citation omitted).

Here, Plaintiff has not shown through clear and convincing evidence that Defendant fraudulently or deceptively induced him to enter into their agreement.  Plaintiff does not take issue with Defendant's actions in forming their agreement; instead, he argues that after the agreement's formation, Defendant breached it based on his false claim as to when Plaintiff's payments were due.  (See Doc. No. 58 ¶ 74.)  There is no evidence, however, that Defendant contemplated breaching the agreement—the allegedly fraudulent and deceptive act—until May 29, 2018, over one year after the contract's formation.  (See id. ¶¶ 51-62.)  Therefore, there is no evidence that Defendant acted fraudulently or deceptively in forming the agreement, and judgment will be entered in favor of Defendant and against Plaintiff on his claims of fraud in the inducement (Count VII) and violation of the Pennsylvania UTPCPL (Count VIII).

## IV.    DAMAGES

Because Defendant breached the agreement, Plaintiff is entitled to any damages resulting from the breach that are proven with reasonable certainty.  See ATACS Corp. v. Trans World Commc'ns, Inc., 155 F.3d 659, 669-70 (3d Cir. 1998).

### A.    The Law on Breach of Contract Damages

Damages and remedies "generally flow from a breach of an agreement."  Harrison, 631 Pa. at 278.  "In general, contract law espouses three distinct yet equally important, theories of damages to remedy a breach of contract: expectation damages, reliance damages, and restitution damages." ATACS Corp., 155 F.3d at 669 (citations omitted).  Regarding these three categories, the Pennsylvania UCC provides:

> [T]he measure of damages for nondelivery or repudiation by the seller is the
> difference between the market price at the time when the buyer learned of the
> breach and the contract price, together with any incidental and consequential
> damages . . . but less expenses saved in consequence of the breach by the seller.

13 Pa. C.S. § 2713(a).  Expectation damages, which are described in the first part of § 2713(a),

before the words "together with," are the "preferred basis" of contract damages.  ATACS Corp.,

155 F.3d at 669.

Incidental damages include expenses incurred in inspecting, receiving, transporting, or

caring for the goods, commercially reasonable charges, and "any other reasonable expense incident

to the delay or other breach."  13 Pa. C.S. § 2715(a)(1)-(3).[7]  Consequential damages are "any loss

resulting from general or particular requirements and needs of which the seller at the time of

contracting had reason to know and which could not reasonably be prevented by cover or

otherwise," and any injury proximately resulting from the breach.  See § 2715(b)(1)-(2).  The

consequential loss must have been reasonably foreseeable to the breaching party.  See Fort

Washington Res. v. Tannen, 901 F. Supp. 932, 943 (E.D. Pa. 1995).  Lost profits are a type of

consequential damage and must be proven with reasonable certainty.  See Nat'l Controls Corp. v.

Nat'l Semiconductor Corp., 833 F.2d 491, 495 (3d Cir. 1987) ("Lost profits are recoverable as

consequential damages in a proper case, such as where a seller knows or has reason to know that

a buyer is purchasing a good for resale");  Gen. Dynafab, Inc. v. Chelsea Indus., Inc., 447 A.2d

958, 960 (Pa. Super. Ct. 1982).

An injured party must establish damages with reasonable certainty, with doubts construed

against the breaching party.  See ATACS Corp., 155 F.3d at 669.  "At a minimum, reasonable

certainty embraces a rough calculation that is not too speculative, vague, or contingent upon some

---

[7]   Because Plaintiff does not allege he suffered incidental damages from Defendant's breach, this
measure of damages does not apply in this case.  (See Doc. No. 58.)

unknown factor." Id. at 669-70 (internal quotation marks omitted).  However, some uncertainty as to the exact amount of damages is not fatal to proving damages with reasonable certainty.  See id. at 670.  "What the law does require in cases of this character is that the evidence shall with a fair degree of probability establish a basis for the assessment of damages."  Id.

### B.   Plaintiff is Entitled to Expectation Damages Resulting from Defendant's Breach, but Not Consequential Damages

#### 1.   Plaintiff is Entitled to $36,190 in Expectation Damages Because of Defendant's Breach

Plaintiff has established with reasonable certainty that the cards' values on the date of Defendant's breach—May 29, 2018—were higher than the parties' agreed upon purchase price. Calculating Plaintiff's damages for Defendant's breach requires first determining which Magic cards were included in the agreement.  Next, the Court must determine the cards' values in May 2018 and compare the values with the purchase price.  Each step will be discussed in turn below.

First, as set forth in Section III supra, in late May 2018, Defendant breached his agreement with Plaintiff for the sale of three groups of Magic cards:  (1) all Defendant's Beta cards with BGS grades of 9.5 and higher;  (2) all Defendant's BGS cards with grades of 9 that Defendant was appealing to BGS for a higher grade;  and (3) all Defendant's incorrectly graded BGS cards that met the previous criteria.  (See Tr. Ex. P-1.)  Thereafter, the parties maintained a list of Defendant's cards that met the criteria, eventually agreeing that 143 of Defendant's Magic cards were in the three categories and settling on $177,415 as the purchase price.  (See Tr. Ex. P-8.)

Although Defendant contests the accuracy of this purchase price, his position is belied by his May 29, 2018 statements to Adam Cai.  Defendant admitted to Cai that that he agreed to a roughly $170,000 purchase price with Plaintiff.  (See Tr. Ex. P-29.)  Moreover, in explaining the deal to Cai, Defendant sent him a spreadsheet titled "All-Brians-Betas-Im-Interested-In-1,"

confirming Plaintiff's claim that the parties finalized a list of cards that met their three categories.[8]
(See id.)  For these reasons, the Court finds that the list of 143 cards in Plaintiff's trial Exhibit
P-8 was the final version of the list of cards agreed upon by the parties, and the $177,415 purchase
price on that list was the agreed upon final purchase price.  (See Tr. Ex. P-8.)

Second, at trial, the parties presented testimony from experts who dealt primarily in
valuing, buying, and selling trading cards.[9]  (See Tr. Exs. P-52; D-9.)  Plaintiff's expert opined that
the cards' fair market values totaled $305,547 in May 2018.[10]  (See Tr. Ex. P-52.)  Defendant's
expert testified, however, that Defendant's cards in total were worth $121,663 in May 2018.[11]  (See
Tr. Exs. D-9, D-12.)

Both experts based their opinions on their expertise in Magic card transactions and sales of
similar Magic cards in and around May 2018.  (See Tr. Ex. P-52; D-9; D-12.)  They also noted that
the purchase prices of Magic cards are influenced by characteristics such as card rarity and

---

[8]  As discussed in Section III.B.1 supra, the parties' agreement to sell three categories of cards, without initially delineating which cards were in those categories, was sufficiently definite to form a contract.

[9]  Because two experts dealt exclusively in trading cards, particularly Magic the Gathering cards, their testimony is given the greatest weight among the proffered experts.  (See Tr. Exs. P-52; D-9.)

[10]  Although the parties agreed to a sale of 143 cards, the experts only provided values for 136 cards because they agreed seven had only nominal values.  (See Doc. No. 58 ¶ 123.)

[11]  The total valuation by Defendant's expert included values for two Magic cards—a Mox Ruby and Mox Pearl—that were not included on the parties' list of cards agreed upon for sale, and those values are excluded in calculating the expert's valuation of the total collection.  (See Tr. Exs. P-8; D-9; D-12; see also Doc. No. 58 at 26 n.5.)  Additionally, the valuations of three cards differ in his original report, written on July 12, 2019, and in his updated report, written on March 11, 2021.  (Compare Tr. Ex. D-9, with Tr. Ex. D-12.)  The Court finds the latter valuations more credible than the former because they were prepared more recently and support Plaintiff's position.  (See ids.)

historical prices for similar cards, but that these factors do not mandate definite card values.  (See Doc. Nos. 53 at 195 ¶¶ 6-7; 58 ¶ 138.)

Consequently, it is evident that the values of Magic cards fluctuate and depend on finding a willing buyer in a limited market.  Given this notion, Defendant's Magic cards did not have set values in May 2018, but a range of reasonable values for which the cards could have been sold. Therefore, although the two experts' valuations differed, a buyer in May 2018 would have paid a price within their reasonable valuations.  For this reason, the Court finds that the average value based on the experts' valuations—$213,605—is a reasonably certain fair market value for the Magic cards in May 2018.[12]

In sum, Plaintiff is entitled to expectation damages equaling the difference between the cards' May 2018 market price of $213,605 and the contract price of $177,415, which is $36,190.

---

[12] In attempting to add another data point to show the cards' values in May 2018, Defendant proffers a story that he sold the cards in July 2018 to two men named Ben and Shawn for roughly $42,000 less than the contract price, a story recounted in Section I.G supra.  (See Doc. Nos. 34-1 at 2; 58 ¶¶ 116, 121.)  Defendant's version of this sale is not being credited because: (1) he does not know the men's last names; (2) the pithy negotiations between the parties as compared to the protracted negotiations between the parties in this case; (3) the curious location and payment methods; and (4) Defendant's failure to produce any documents related to the sale. (See Doc. Nos. 34-1 at 6-8; 53 at 114 ¶¶ 16-17.)  Although Defendant avoided falling under the legal maxim vendens eandem rem duobus falsarius est, this purported resale values will not be factored into the cards' May 2018 values.  See Vendens Eandem Rem Duobus Falsarius Est, BLACK'S LAW DICTIONARY App. B (11th ed. 2019) (defined as "[a] vendor is fraudulent if he sells the same thing to two (separate) buyers.").

Furthermore, Defendant's position also is unpersuasive because of his May 29, 2018 comments to Cai.  Attempting to justify cancelling the agreement with Plaintiff, Defendant admitted that the cards' values increased by $50,000 since the agreement with Plaintiff was consummated. (See Tr. Ex. P-29.)  He acknowledged that "all the cards in the deal have gone up," including his quad Beta cards that "have gone up significantly in the past 3 months."  (Id.)  Defendant's admissions carry great weight and support a finding that the cards' values in May 2018 were higher than the contract price.

### 2.     Plaintiff Has Not Proven His Entitlement to Consequential Damages with Reasonable Certainty

Plaintiff, however, has not proven that consequential damages caused by Defendant's breach were reasonably foreseeable to the parties when they formed the agreement.  Plaintiff contends that because both parties viewed graded Magic cards as an investment with a resale value, he is entitled to the fair market value of the cards beyond the date of Defendant's breach.  (See Doc. No. 58 ¶¶ 86-97, 205-06.)  Defendant disagrees, submitting that Plaintiff has not proven the Magic cards' values beyond May 2018 with reasonable certainty and, in any event, the values beyond May 2018 were not reasonably foreseeable to the parties when contracting.  (See Doc. No. 59 at 14 ¶¶ 15-16.)

Plaintiff sought to purchase Defendant's Magic cards as an investment.  (See Doc. No. 58 ¶ 87.)  Although Plaintiff expected that the cards' values would increase when he entered into the agreement, neither he nor Defendant knew with reasonable foreseeability whether the cards would increase or decrease in value.[13]  Moreover, Defendant's knowledge that Plaintiff intended to resell the cards at sometime in the future does not open the door to liability for all future increases in the values of the cards.  Thus, Plaintiff is not entitled to consequential damages related to Defendant's breach.[14]

---

[13]  It is inconsequential that in May 2018 Defendant believed the cards' values increased because reasonable foreseeability is measured from the time of contracting, not the time of breach.  See 13 Pa. C.S. § 2715(b)(1)-(2); Fort Washington Res. v. Tannen, 901 F. Supp. 932, 943 (E.D. Pa. 1995).

[14]  Plaintiff also contends that since he sold some of his own Magic cards to third parties to finance the payments to Defendant, which Defendant knew about, he is entitled to damages resulting from future increases in those cards' values.  (See Doc. No. 58 ¶¶ 85, 112-15.)  This argument fails for the same foreseeability pitfall in evaluating potential increases or decreases in the value of Defendant's Magic cards, and similarly is without merit.

**V.      CONCLUSION**

For the foregoing reasons, judgment will be entered in favor of Plaintiff and against Defendant on his claim for breach of contract (Count I) in the total amount of $36,190.  Judgment will be entered in favor of Defendant and against Plaintiff on the claims for fraud in the inducement (Count VII) and for violation of the Pennsylvania UTPCPL (Count VIII).  An appropriate Order follows.